1

HONORABLE MARSHA J. PECHMAN

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

10   SUE ELLEN DUMDIE, Individually and
on Behalf of all Others Similarly Situated,

11                                              No.  C-08-1251 MJP

                              Lead
12                            Plaintiff,        **DEFENDANTS' MOTION TO DISMISS
                                               THE SECOND AMENDED CLASS ACTION
13        v.                                   COMPLAINT**

14   WM TRUST I, WM TRUST II, WM               Noted for Issue:  March 27, 2009
     STRATEGIC ASSET MANAGEMENT               Action filed:       August 20, 2008
15   PORTFOLIOS, LLC, WM ADVISORS,
     INC., WM FUNDS DISTRIBUTOR, INC.,
16   WILLIAM G. PAPESH, DANIEL L.
     PAVELICH, RICHARD C. YANCY,
17   KRISTIANNE BLAKE, EDGE ASSET
     MANAGEMENT, INC., PRINCIPAL
18   FINANCIAL GROUP, INC., PRINCIPAL
     INVESTORS FUND, INC., PRINCIPAL
19   FUNDS DISTRIBUTOR, INC.,

20                            Defendants.

21

22

23

24

25

26

MOTION TO DISMISS
No. C-08-1251 MJP

1

## TABLE OF CONTENTS

2

**Page**

3    I.    INTRODUCTION ...................................................................................... 1

4    II.   STATEMENT OF FACTS .......................................................................... 3

5          A.    Parties ............................................................................................ 3

6          B.    The *Zapien* Action ......................................................................... 4

7          C.    This Action ..................................................................................... 5

8    III.  LEGAL STANDARD ON MOTION TO DISMISS ..................................... 6

9    IV.   THE SAC FAILS TO PLEAD A MATERIAL MISSTATEMENT OR
           OMISSION ................................................................................................. 7

10         A.    There Is No Duty to Disclose the Allegedly Omitted Information .......... 8

11         B.    The Prospectuses Accurately and Adequately Disclosed the Revenue-
12               Sharing Arrangement .................................................................... 10

13         C.    Defendants Did Not Misstate or Omit the Amounts of Their Advisor
14               Paid Fees ...................................................................................... 15

     V.    THE SAC DOES NOT ALLEGE SCIENTER WITH PARTICULARITY ............... 16
15
           A.    The "Evolution" and "Minimize Potential Liability" Allegations
16               Support No Inference of Scienter .................................................. 17

17         B.    The SAC Offers No Factual Support For Its Allegations Concerning
                 the So-Called Cerulli Report ........................................................ 19
18
           C.    The SAC's Misinterpretation of the Broker-Dealer Brochure Also
19               Does Not Support an Inference of Scienter .................................. 19

20         D.    The SAC's Motive Allegations Do Not Create a Strong Inference of
21               Scienter ......................................................................................... 20

22         E.    A Holistic Review of These Allegations Creates an Equally Feeble
                 Inference of Scienter .................................................................... 20
23
           F.    The SAC Also Fails to Meet the Pleading Standard of Rule 9(b) and
24               the PSLRA as to the Independent Directors ................................ 21

25   VI.   THE SAC FAILS TO PLEAD TRANSACTION CAUSATION WITH
           PARTICULARITY ...................................................................................... 23
26

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA 92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

**TABLE OF CONTENTS**
(continued)

Page

VII.    PLAINTIFF FAILS TO PROPERLY PLEAD DAMAGES AND LOSS CAUSATION ................................................................................ 25

    A.    The SAC Has Not Alleged Damages to Support the Securities Act Claims ....................................................................................... 25

    B.    Plaintiff Has Not Alleged Loss Causation on the Exchange Act Claims ....................................................................................... 26

VIII.   PLAINTIFF FAILS TO PLEAD "SCHEME LIABILITY" UNDER RULE 10B-5 ............................................................................... 27

IX.     THE COMPLAINT MUST BE DISMISSED BECAUSE ITS CLAIMS ARE STALE ................................................................... 28

    A.    The SAC's Claims Are Time-Barred Because Ms. Dumdie and the Putative Class Were Placed on Inquiry Notice of the APF Long Before This Suit Was Filed ............................................. 28

    B.    Almost All of the SAC's Claims Are Also Stale Under the Statutes of Repose ....................................................................... 32

    C.    The *Zapien* Action Did Not Toll Plaintiff's Claims ......................... 32

        1.    There is No *American Pipe* Tolling Where the Original Action Was Dismissed for Lack of Standing ................................... 33

        2.    *American Pipe* Tolling Does Not Allow Subsequent Class Actions ........................................................................... 33

        3.    Even if Tolled, Most Claims in the SAC are Still Stale ..................... 35

X.      MOST OF LEAD PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING ................................................. 36

    A.    Plaintiff Has No Standing for Claims Based on Funds She Did Not Own ............................................................................. 36

    B.    This Action Only Presents a Case or Controversy for the WM Portfolios Funds Owned by Ms. Dumdie ............................... 37

XI.     THE SAC HAS NOT ESTABLISHED CONTROL PERSON LIABILITY ............ 37

    A.    Plaintiff Has Not Adequately Alleged a Primary Violation of Federal Securities Law Against Defendants Pavelich, Yancy, Blake, Papesh, WM Advisors or WM Distributor ................................... 38

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1

**TABLE OF CONTENTS**
**(continued)**

2
                                                                                            **Page**

3        B.      Plaintiff Has Also Not Adequately Alleged Actual Control and
                 Culpable  Participation by the Independent Directors....................................38

4   XII.   CONCLUSION ........................................................................................................40

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re AIG Advisor Group Sec. Litig.*,
  No. 06 CV 1625 (JG), 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ............... 11, 12, 18, 36

*In re American Funds Sec. Litig.*,
  556 F. Supp. 2d 1100 (C.D. Cal. 2008) .............................................. 31, 33, 34, 35

*In re American Mutual Funds Fee Litig.*,
  No. CV 04-5593-GAF (RNBx), 2005 WL 3989803 (C.D. Cal. Dec. 16, 2005) ............. 34, 36

*American Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974) .............................................................. 32, 33, 34

*Andrews v. Orr*,
  851 F.2d 146 (6th Cir. 1988) ............................................................ 34

*In re Bank of Boston*,
  762 F. Supp. 1525 (D. Mass. 1991) ...................................................... 36

*Basch v. The Ground Round, Inc.*,
  139 F. \3d 6 (1st Cir. 1998) ............................................................ 34

*Basic Inc., et al., v. Levinson*,
  485 U.S. 224 (1988) .................................................................. 23, 24

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ................................................................. 6, 15

*Benzon v. Morgan Stanley Distrib., Inc.*,
  420 F.3d 598 (6th Cir. 2005) ........................................................ passim

*Berry v. Valence Tech., Inc.*,
  175 F.3d 699 (9th Cir. 1999) ............................................................ 11

*Betz v. Trainer Wortham & Co.*,
  486 F.3d 590 (9th Cir. 2007) ......................................................... 29, 32

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ..................................................................... 36

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ............................................................ 12

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ............................................................. 17

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Castillo v. Dean Witter Discover & Co.*,
   No. 97 Civ. 1272 (RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998)............... 18, 20, 26, 27

*Catholic Social Serv. v. INS*,
   232 F.3d 1139 (9th Cir. 2000) ...................................................................................... 34, 35

*Clark v. Nevis Capital Mgmt., LLC*,
   No. 04 Civ. 2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ....................................... 24, 25

*In re Colonial Ltd. P'ship Litig.*,
   854 F. Supp. 64 (D. Conn. 1994) ........................................................................................ 33

*In re Convergent Techs. Sec. Litig.*,
   948 F.3d 507 (9th Cir. 1991) .............................................................................................. 23

*Crown, Cork & Seal Co. v. Parker*,
   462 U.S. 345 (1983) ........................................................................................................... 32

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ...................................................................................... 23, 24

*In re Ditech Networks, Inc. Deriv. Litig.*,
   No. C 06-5157 JF, 2007 WL 2070300 (N.D. Cal. July 16, 2007)......................................... 27

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...................................................................................................... 23, 26

*Durham v. Kelly*,
   810 F.2d 1500 (9th Cir. 1987) ............................................................................................ 38

*In re Eaton Vance Corp. Sec. Litig.*,
   219 F.R.D. 38 (D. Mass. 2003) .......................................................................................... 36

*Eckstein v. Balcor Film Investors*,
   58 F.3d 1162 (7th Cir. 1995) ............................................................................................. 30

*In re Elscint, Ltd. Sec. Litig.*,
   674 F. Supp. 374 (D. Mass. 1987)....................................................................................... 33

*F.L. Heywood v. Cell Therapeutics, Inc.*,
   No. C05-0396RSM, 2006 WL 5701625 (W.D. Wash. May 4, 2006).................................... 38

*Falkowski v. Imation Corp.*,
   309 F.3d 1123 (9th Cir. 2002) .............................................................................................. 6

*Fouad v. Isilon Sys., Inc.*,
   No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)............................. 6, 16

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Gilead Sciences Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ............................................................ 26

*Gompper v. Visx, Inc.*,
   298 F.3d 893 (9th Cir. 2002) .............................................................. 22

*Griffin v. Singletary*,
   17 F.3d 356 (11th Cir. 1994) .............................................................. 34

*Hobbs v. Police Jury of Morehouse Parish*,
   49 F.R.D. 176 (W.D. La. 1970) .......................................................... 33

*Hoffman v. UBS-AG*,
   No. 05 Civ. 6817 (LBS), 2008 WL 4684168 (S.D.N.Y. Oct. 22, 2008) ..................... 9, 12, 37

*In re Infonet Serv. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1106 (C.D. Cal. 2003 ................................................ 30

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358, 377 (S.D.N.Y. 2003) ......................................... 10

*Korwek v. Hunt*,
   827 F.2d 874 (2d Cir. 1987) .............................................................. 34

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ............................................... 39

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ......................................... 38

*Malone v. Clark Nuber, P.S.*,
   No. C07-2046 RSL, 2008 WL 2545069 (W.D. Wash. June 23, 2008) ................. 28

*McPhail v. First Command Fin. Planning, Inc.*,
   247 F.R.D. 598 (S.D. Cal. 2007) ....................................................... 24

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................... 25

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003) ............................................... 7, 9

*Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
   434 F. Supp. 2d 233 (S.D.N.Y. 2006) ............................................... 18

*In re Metawave Comm. Corp. Sec. Litig.*,
   298 F. Supp. 2d 1056 (W.D. Wash. 2003). ....................................... 38, 39

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA 92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page(s)**

3

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007)........................................................................32, 37

4

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
5
    540 F.3d 1049 (9th Cir. 2008) ...................................................................................16, 26

6

*In re Morgan Stanley & Van Kampen Mutual Fund Sec. Litig.*,
    No. 03 Civ. 8208 RO, 2006 WL 1008138 (S.D.N.Y. 2006) .........................................passim

7

*In re Mutual Funds Inv. Litig.*,
8
    384 F. Supp. 2d 845 (D. Md. 2005)...............................................................................25, 26

9

*In re New Century*,
    __ F. Supp. 2d __, No. CV 07-00931 DDP (JTLx), 2008 WL 5147991 (C.D.
10
    Cal. Dec. 03, 2008)..................................................................................................16, 22

11

*In re Oak Tech. Sec. Litig.*,
    No. 96-20552 SW, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997)....................................21, 22

12

*Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*,
13
    487 F.3d 261 (5th Cir. 2007) .............................................................................................24

14

*Palmer v. Stassinos*,
    236 F.R.D. 460 (N.D. Cal. 2006). ....................................................................................33

15

*Pennsylvania Ave. Funds v. Borey*,
16
    No. C06-173RAJ, 2008 WL 426509 (W.D. Wash. Feb. 13, 2008) .........................21, 22, 38

17

*Pierce v. Novastar Mortgage, Inc.*,
    Civ. No. 05-5825 RJB, 2006 US Dist LEXIS 62875 (W.D. Wash. Sept. 6,
18
    2006)..................................................................................................................................34

19

*Putkowski v. Irwin Home Equity Corp.*,
    423 F. Supp. 2d 1053 (N.D. Cal. 2006)..............................................................................33

20

*In re Quarterdeck Office Sys. Inc. Sec. Litig.*,
21
    No. CV-92-3090-DWW (GHKx), 1994 WL 374452 (C.D. Cal. Mar. 24, 1994) ................34

22

*Raines v. Byrd*,
    521 U.S. 811 (1997) ...........................................................................................................36

23

*Reno v. Catholic Social Serv., Inc.*,
24
    509 U.S. 43 (1993) .............................................................................................................35

25

*Robbin v. Fluor Corp.*,
    835 F.2d 213 (9th Cir. 1987) .............................................................................................33

26

27

28

O
O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
   765 F.2d 1334 (5th Cir. 1985) ................................................................ 34

*Salinger v. Projectavision, Inc.*,
   934 F. Supp. 1402 (S.D.N.Y. 1996) ......................................................... 29

*Sheppard v. Capital One Bank*,
   06-7535 GAF (FFMx), 2007 U.S. Dist. LEXIS 70061 (C.D. Cal. July 12, 2007) ............... 34

*Shurkin v. Golden State Vinters Inc.*,
   471 F. Supp. 2d 998 (N.D. Cal. 2006) ...................................................... 36

*Siemers v. Wells Fargo & Co.*,
   No. C 05-04518 WHA, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ............................ 14

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ............................................... 3, 16, 20, 21

*Simpson v. AOL Time Warner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) .............................................................. 27

*In re Solomon Smith Barney Mutual Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. July 26, 2006) ............................................... 7

*South Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .......................................................... 16, 21

*In re Stac Elec. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996). ....................................................... 6, 10, 28

*Steckman v. Hart Brewing Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ......................................................... 6, 15

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   128 S. Ct. 761 (2008) ..................................................................... 27

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .............................................................. 22

*Teachers' Retirement Sys. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) .............................................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd., et al.*,
   127 S. Ct. 2499 (2007) ............................................................ 6, 16, 20

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ............................................................... 6

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA 92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page(s)**

3
*In re Van Wagoner Funds, Inc. Sec. Litig.,*
　　382 F. Supp. 2d 1173 (N.D. Cal. 2004) ......................................................... 23, 25

4

*In re Vantive Corp. Sec. Litig.,*
5
　　283 F.3d 1079 (9th Cir. 2002) ..................................................................... 17

6
*Waldock v. M.J. Select Global, Ltd.,*
　　No. 03 C 5293, 2005 WL 3542527 (N.D. Ill. Dec. 27, 2005) ............................... 39

7

*Warren v. Fox Family Worldwide, Inc.,*
8
　　328 F.3d 1136 (9th Cir. 2003) ....................................................................... 6

9
*In re Washington Pub. Power Supply Sys. Sec. Litig.,*
　　No. 551, 1988 WL 158948 (W.D. Wash. July 14, 1988) .................................... 39

10

*In re Watchguard Sec. Litig.,*
11
　　No. C05-678J, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) .......................... 38

12
*Whirlpool Fin. Corp. v. G.N. Holdings, Inc.,*
　　67 F.3d 605 (7th Cir. 1995) .................................................................. 11, 30

13

*White v. Melton,*
14
　　757 F. Supp. 267 (S.D.N.Y. 1991) ................................................................. 10

15
*Yang v. Odom,*
　　392 F.3d 97 (3rd Cir. 2004) ......................................................................... 34

16

*Young v. Nationwide Life Ins. Co.,*
17
　　183 F.R.D. 502 (S.D. Tex. 1998) ................................................................... 24

18
*Zapien v. Washington Mutual, Inc.,*
　　No. 07-CV-385 DMS, 2008 U.S. Dist. LEXIS 67137 (S.D. Cal. June 17, 2008) .......... passim

19

*Zapien v. Washington Mutual, Inc.,*
20
　　No. 07-CV-385 DMS, 2008 U.S. Dist. LEXIS 67136 (S.D. Cal. Aug. 19, 2008) ................. 5

21
*Zucco Partners LLC v. Digimarc Corp.,*
　　__ F.3d __, No. 06-35758, 2009 WL 57081 (9th Cir. Jan. 12, 2009) ........................... passim

22

**STATUTES**

23

Fed. Rule Civ. Pro. 12(b)(6) ............................................................................. 6
24

SEC Rule 10b-5 ................................................................................... 23, 27
25

Securities Act of 1933, Section 11 ................................................................. passim
26

27

28

O
**O'MELVENY & MYERS**
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Securities Act of 1933, Section 12(a) ......................................................... 5, 32

Securities Act of 1933, Section 15 ............................................................ 5, 37

Securities Exchange Act of 1934, Section 10(b) ...................................... passim

Securities Exchange Act of 1934, Section 20(a) ......................................... 5, 37

Title 15, United States Code Section 77l(a)(2) .............................................. 25

Title 15, United States Code Section 77k(e) .................................................. 25

Title 15, United States Code Section 77l(a) ................................................... 36

Title 15, United States Code Section 77m .................................................... 32

Title 15, United States Code Section 78u-4(b)(1) ........................................... 22

Title 15, United States Code Section 78u-4(b)(2) ........................................... 16

Title 15, United States Code Section 77j(a)(3) ............................................... 13

Title 17, Code of Federal Regulations Section 270.8b-16 ............................... 13

Title 28, United States Code Section 1658(b) ............................................... 29

Title 28, United States Code Section 1658(b)(2) ........................................... 32

**RULES**

Federal Rules of Civil Procedure, Rule 9(b) ............................................. passim

**OTHER AUTHORITIES**

Paul Roye, *Testimony Concerning the Mutual Funds Integrity and Fee
   Transparency Act of 2003*, at 6 (June 18, 2003) ................................... 9, 13

*Registration Form Used by Open-Ended Management Investment Cos.*,
   SEC Release Nos. 33-7512, 34-39748, 63 Fed. Reg. 13916 (Mar. 23, 1998) ....... 8

*Confirmation Requirements and Point of Sale Disclosure Requirements for
   Transactions in Certain Mutual Funds and Other Securities, and Other
   Confirmation Requirement Amendments, and Amendments to Registration
   From for Mutual Funds*,
   Release Nos. 33-8358, 34-49148, IC-26341, 59 Fed. Reg. 6438 (Feb. 10, 2004) ......... 9

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA 92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**CONSTITUTIONAL PROVISIONS**

United States Constitution, Article III, Section 2 ........................................................................ 36

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1    I.        **<u>INTRODUCTION</u>**

2         The centerpiece of the Second Amended Complaint ("SAC" or "Complaint") filed by

3    Lead Plaintiff Sue Ellen Dumdie ("Ms. Dumdie" or "Plaintiff") is the claim that Defendants

4    perpetrated a fraud because they merely disclosed that additional compensation "***may***" be made

5    to broker-dealers in connection with certain mutual fund sales, when arrangements for those

6    payments were already in place.  Even if Plaintiff had accurately described Defendants'

7    disclosures on this subject (which she did not), her claim amounts to what the Sixth Circuit

8    Court of Appeals—the only federal appellate court that has addressed identical claims—

9    dismissed as a "semantic quibble."  *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 612

10   (6th Cir. 2005).  Worse yet for Plaintiff's case, the SEC filings by the mutual funds at issue in

11   the WM Group of Funds (the "Funds") *publicly disclosed* to Ms. Dumdie and the putative class[1]

12   the dealer agreements in use by the Funds, which set forth in detail the very fee-sharing

13   arrangements that Ms. Dumdie complains were *not* disclosed.  Those dealer agreements also

14   specified that the fee-sharing arrangements could be changed or terminated on short notice,

15   making the word "may" particularly appropriate to describe the arrangements in the Funds'

16   class-period Prospectuses and Registration Statements.  This is not the stuff of which a securities

17   fraud claim is made.

18        Plaintiff pursues a second, equally vacuous theory of securities fraud:  alleging that the

19   Advisor Paid Fee ("APF") paid to participating broker-dealers to encourage sale of the Funds

20   was not 50 basis points as disclosed, but was in fact 75 basis points.  This allegation is based

21   entirely on Plaintiff's untenable reading of a single marketing document directed to the broker-

22   dealer community that states that the ***"total fees"*** that broker-dealers could earn by selling the

23   Funds was 75 basis points.  Since broker-dealers could earn 25 basis points in 12b-1 fees from

24   WM Distributor and the 50 basis points in APF fees from WM Advisors, the document relied on

25
26   [1] The SAC defines the putative class as:  "All persons or entities that purchased or otherwise acquired shares, units or likewise interests in any of the WM Funds (including through the reinvestment of Fund dividends), between March 1, 2002, through December 31, 2006, inclusive."  (SAC ¶ 3 n.3.)

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1   by Ms. Dumdie is fully consistent with Defendants' public disclosures of the particular fees

2   available to broker-dealers.  The marketing document does not support Plaintiff's allegation of

3   fraud.  Ms. Dumdie alleges nothing else in support of her speculation that the APF was 75 basis

4   points.  Mere speculation does not meet the pleading requirements for securities fraud.

5        The SAC must be dismissed for at least several reasons.  First, and most fundamentally,

6   it is black letter law—and common sense—that a material misstatement/omission claim cannot

7   be based on information that was neither misstated nor omitted.  The SAC fails to allege a

8   material misstatement or omission because the Funds adequately, and repeatedly, disclosed the

9   APF and revenue sharing program.  Ms. Dumdie admits that she and the putative class received

10   the Funds' Prospectuses during the class period, and is therefore on inquiry notice of both their

11   contents and the related Registration Statements filed with the SEC.

12        Second, the SAC does not—and cannot—plead scienter with particularity.  Third, the

13   SAC fails to adequately allege reliance ("transaction causation") by either Ms. Dumdie or the

14   putative class on the alleged misstatements.  Fourth, the SAC does not establish a causal link

15   between alleged damages and information that investors knew (or should have known) at the

16   time they invested (i.e., "loss causation").  Fifth, because a reasonably diligent investor would

17   have known about the incentive payments of which Ms. Dumdie now complains, investors were

18   on inquiry notice of these claims in 2004.  This action was filed on August 20, 2008, years after

19   the one- and two-year notice-inquiry-based statutes of limitations had already expired.  (Many of

20   Ms. Dumdie's claims are also barred by statutes of repose.)  Sixth, Ms. Dumdie never purchased

21   half of the Funds challenged in the Complaint, and therefore has no standing to assert claims

22   relating to them.  Moreover, because the APF was only paid on the WM Portfolios Funds,

23   purchasers of the other Funds suffered no injury and therefore lack standing.  Finally, the SAC's

24   control person liability claims fail because the SAC does not adequately state a claim for primary

25   liability and inadequately alleges control.  In sum, the Complaint is tardy and baseless, and it

26   must be dismissed.

1    **II.     STATEMENT OF FACTS**[2]

2         **A.     Parties**

3         During the putative class period, Defendants WM Trust I, WM Trust II, and WM

4    Strategic Asset Management Portfolios, LLC (collectively, the "Registrants") were registered

5    with the U.S. Securities and Exchange Commission ("SEC") as open-end management

6    investment companies under the Investment Company Act of 1940.  The Registrants issued

7    several series of shares reflecting specific investment strategies, commonly known as mutual

8    funds.[3]  These included the Funds allegedly purchased by Plaintiff.  (SAC ¶ 16.)

9         Defendants WM Advisors, Inc. ("WM Advisors") and WM Funds Distributor, Inc.

10   ("WM Distributor") provided investment management and distribution services, respectively, to

11   the Funds.  (SAC ¶ 21.)

12        After the close of the alleged class period, a subsidiary of Defendant Principal Financial

13   Group, Inc. acquired WM Advisors and WM Distributor, and renamed them Edge Asset

14   Management, Inc. and Principal Funds Distributor, Inc., respectively.  Thereafter, in January

15   2007, all assets of the Funds were transferred to Defendant Principal Investors Fund, Inc., which

16   is a registered investment company, and all shareholders of the Funds became shareholders of

17   Principal Investors Fund, Inc.[4]  (SAC ¶¶ 82–83; *see* Request for Judicial Notice ("RJN") and

18   Declaration of Andrew R. Escobar ("Escobar Decl."), Ex. A at 3-4.)

19        The SAC names four individual defendants:  William G. Papesh, the President, CEO and

20   Director of WM Trust I, WM Trust II, WM Portfolios, WM Advisors and WM Distributor

21   during the class period; Daniel Pavelich, Chairperson of the WM Funds Audit Committee during

22   ─────────────
     [2] This motion is based on the facts alleged in the SAC and those of which the Court may take judicial notice.  *See,*
23   *e.g., In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).
     [3] The Funds included Money Market, Tax-Exempt Money Market, U.S. Government Securities, Income, High
24   Yield, Tax-Exempt Bond, REIT, Small Cap Value, Equity Income, Growth & Income, West Coast Equity, Mid Cap
     Stock, California Money, Short Term Income, California Municipal, California Insured Intermediate Municipal,
25   Growth, International Growth, Small Cap Growth, Strategic Growth, Conservative Growth, Balanced, Conservative
     Balanced, and Flexible Income.  (SAC ¶ 1 n 2.)
26   [4] WM Trust I, WM Trust II, and WM Strategic Asset Management Portfolios LLC have all been dissolved.  (*See*
     Escobar Decl., Exs. B–D.)

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1    the class period; Richard Yancy, the Lead Trustee on the Funds' common Board of Trustees

2    during the class period; and Kristianne Blake, the Chairperson of the WM Operations and

3    Distribution Committee during the class period (Defendants Pavelich, Yancy, and Blake are

4    hereinafter collectively referred to as the "Independent Directors").  (SAC ¶¶ 22–25.)

5        The SAC alleges that, between March 1, 2002, and December 31, 2006, Ms. Dumdie

6    purchased and sold some but not all of the twenty-four Funds.  (SAC ¶ 16.)

7        **B.**    **The *Zapien* Action**

8        The Second Amended Complaint has many antecedents.  On February 28, 2007, plaintiff

9    Luz Zapien, represented by Finklestein & Krinsk, one of the firms representing Plaintiff in this

10   action, filed a class action complaint in the United States District Court for the Southern District

11   of California.  As in this case, the *Zapien* action alleged that investment advisors for the Funds

12   were making inadequately disclosed payments to the broker-dealers selling those funds, which

13   allegedly created an undisclosed conflict of interest.  (SAC ¶¶ 86–87.)  Defendants[5] moved to

14   dismiss the *Zapien* first amended complaint for lack of standing, violation of the statute of

15   limitations, and failure to plead with particularity the required elements of material

16   misstatement, scienter, and loss causation.  *Zapien v. Washington Mutual, Inc.*, No. 07-CV-385

17   DMS, 2008 U.S. Dist. LEXIS 67137, at *5 (S.D. Cal. June 17, 2008).  Judge Sabraw dismissed

18   the complaint without prejudice for lack of standing on January 17, 2008, without addressing the

19   remaining defects in Zapien's claims.  *Id.*, at *5.

20       On February 6, 2008, Zapien filed a second amended complaint.  *Id.*, at *6.  Since the

21   second amended complaint did not cure the standing and statute of limitations problems, let

22   alone the other shortcomings of its predecessor, defendants obtained permission to bifurcate their

23   motion to dismiss and to focus first on standing and the statute of limitations.  (*Id.*)  Judge

24   Sabraw granted the defendants' motion for lack of standing on June 17, 2008, dismissing the

25   *Zapien* action without leave to amend.  *Id.*, at *9–11.  Ms. Zapien moved for reconsideration on

26   _____

[5] Neither Mr. Papesh nor the Independent Directors were defendants in the *Zapien* action.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1    July 1, 2008, and the court denied that motion on August 19, 2008.  *Zapien v. Washington*

2    *Mutual, Inc.*, No. 07-CV-385 DMS, 2008 U.S. Dist. LEXIS 67136 (S.D. Cal. Aug. 19, 2008).

3    Ms. Zapien then filed a notice of appeal, which is currently pending before the Ninth Circuit

4    Court of Appeals.  (SAC ¶ 90.)

5        **C.    This Action**

6        On August 20, 2008—more than two months after the *Zapien* action was dismissed with

7    prejudice—original named plaintiff June Robinson filed this putative class action lawsuit.[6]

8    (Docket Entry ("D.E.") No. 1.)  Ms. Robinson also filed a Notice of Related Case, because every

9    Defendant named in the *Zapien* action was originally named in this litigation and both actions

10   raise the same basic allegations.

11       Ms. Robinson avoided an automatic stay of this action by filing the First Amended

12   Complaint on September 26, 2008, which dropped defendants Washington Mutual, Inc.

13   ("WMI") and WM Financial Services ("WMFS") from this action on the same day WMI filed

14   for bankruptcy.  (D.E. Nos. 5, 22.)   After the Court appointed Ms. Dumdie as the Lead Plaintiff

15   (D.E. No. 29), she filed the Second Amended Complaint on December 12, 2008 (D.E. No. 39).

16   The SAC is the subject of this motion to dismiss.

17       At its heart, the SAC alleges two material misrepresentations in the Funds' five

18   prospectuses from 2002 through 2006.  First, like its five predecessors, the SAC claims that

19   Defendants failed to disclose the revenue-sharing arrangement because the public filings only

20   said that such arrangements "may" exist.  (SAC ¶ 10.)  Second, Ms. Dumdie claims that

21   Defendants misstated the size of the payments to broker-dealers.  (*Id.* ¶ 4.)  Based on these

22   allegations, the SAC asserts five claims under Sections 11, 12(a), and 15 of the Securities Act,

23   and Sections 10(b) and 20(a) of the Exchange Act.

24

25

26   _____
[6] Plaintiff Robinson was also represented by counsel for Ms. Dumdie.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1    ## III.    LEGAL STANDARD ON MOTION TO DISMISS

2           Under Rule 12(b)(6), a complaint must be dismissed when it fails to plead sufficient facts

3    stating a claim to relief that is "plausible on its face."[7]  *See Bell Atlantic Corp. v. Twombly*, 127

4    S. Ct. 1955, 1974 (2007) (dismissing complaint where "plaintiffs have not nudged their claims

5    across the line from conceivable to plausible").  In ruling on a 12(b)(6) motion, the court may

6    consider the facts alleged in the complaint, documents attached to or specifically referenced

7    within the complaint, and matters of which the court may take judicial notice.  *See United States*

8    *v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Conclusory allegations and unwarranted

9    inferences are insufficient to defeat a motion to dismiss.  *Warren v. Fox Family Worldwide, Inc.*,

10   328 F.3d 1136, 1139 (9th Cir. 2003).  Moreover, a court is not required to accept facts in the

11   complaint that contradict facts in documents referred to in the complaint.  *Steckman v. Hart*

12   *Brewing Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998).

13          Ms. Dumdie's securities fraud claims are subject to the heightened pleading requirements

14   of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure

15   9(b).  To state a claim that is plausible on its face, her complaint must "state with particularity

16   both the facts constituting the alleged violation, and the facts evidencing scienter."[8]  *Tellabs, Inc.*

17   *v. Makor Issues & Rights, Ltd., et al.*, 127 S. Ct. 2499, 2504 (2007); *see also Zucco Partners*

18   *LLC v. Digimarc Corp.*, __ F.3d __, No. 06-35758, 2009 WL 57081, at *5 (9th Cir. Jan. 12,

19   2009).  The SAC utterly fails to meet this standard and its claims must be dismissed.

20

21

22   ---

[7] In addition to Rule 12(b)(6), Defendants also move to dismiss for lack of jurisdiction over the subject matter of this

23   case as a result of Ms. Dumdie's lack of standing to sue under Article III of the Constitution because she did not
     own half of the mutual funds in question.

24   [8] Despite the SAC's disclaimers to the contrary (SAC ¶¶ 98, 106, 115), its Securities Act claims are subject to the
     heightened pleading requirements of Rule 9(b).  *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133-34 (9th Cir.

25   2002); *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1404-05 & n.2 (9th Cir. 1996) (applying Rule 9(b) to Securities Act
     claims that sound in fraud); *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *3 (W.D. Wash.

26   Dec. 29, 2008) (holding that Section 11 and Section 12 claims that necessarily allege fraudulent conduct are subject
     to Rule 9(b)).

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA 92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

## IV.     THE SAC FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION

The SAC does not sufficiently allege the essential element of a material misstatement or omission by Defendants.  Nor can she do so in light of the facts actually disclosed by the Funds.  The securities laws do not mandate disclosure of the additional details concerning compensation to broker-dealers that Ms. Dumdie alleges should have been set forth in the Prospectuses at issue.  As such, to assert a claim under either the Securities Act or the Exchange Act, the SAC must allege *particular facts* concerning the omitted details, showing that their omission rendered the affirmative statements in the 2002 through 2006 Prospectuses materially misleading.  *See Benzon*, 420 F.3d at 611–12; *In re Solomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 587 (S.D.N.Y. July 26, 2006); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 434 (S.D.N.Y. 2003).  It has failed to do so.  The disclosures in the Registration Statements show that the Prospectuses were not misleading, much less materially so.

The SAC alleges two categories of misrepresentations.  First, the SAC claims that the Funds' Prospectuses provided inadequate disclosure when they stated that the investment advisors "may" make payments to broker-dealers when, in fact, WM Advisors and WM Distributor had already entered into some revenue-sharing arrangements with broker-dealers.  (SAC ¶ 10.)  This claim fails because every one of the Funds' Registration Statements (which included that year's Prospectus) adequately disclosed the revenue-sharing arrangement, even attaching or incorporating a form of broker-dealer agreement with the specific terms of the arrangement.

Second, the SAC claims that the Funds' Prospectuses and Registration Statements "never publicly disclosed the fact that the APF was 75 Bps instead of the 50 Bps as represented by the Registrants in the Prospectuses." (*See, e.g.,* SAC ¶¶ 57, 61.)  As discussed below, this argument fails to meet the pleading standard for fraud claims because the Registration Statements accurately disclosed the size of the payments to broker-dealers (50 Bps).  Ms. Dumdie's claims

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1  to the contrary are premised entirely on a single marketing document that does not support Ms.

2  Dumdie's reading that the APF was 75 Bps.

3       **A.**     **There Is No Duty to Disclose the Allegedly Omitted Information**

4         Mutual funds, also known as Open-Ended Management Investment Companies, must use

5  SEC Form N-1A to register under the Investment Company Act of 1940 and offer shares for sale

6  under the Securities Act.  (*Registration Form Used by Open-Ended Management Investment*

7  *Cos.*, SEC Release Nos. 33-7512, 34-39748, 63 Fed. Reg. 13916, 13916 (Mar. 23, 1998),

8  attached as Escobar Decl., Ex. E at 2, 4-5.)  This form provides the federal requirements for the

9  information that must be disclosed in a mutual fund's registration statement, which includes its

10  prospectus and its statement of additional information ("SAI").  (*Id.* at 4–5.)  Moreover, Form

11  N-1A was designed by the SEC to delineate those disclosures that are material to investors in

12  making their investment decisions *without* overwhelming them with less essential information.

13  (*Id.* at 2–4.)

14         Ms. Dumdie does *not* allege that any of the Registration Statements or Prospectuses cited

15  in the SAC failed to comply with the disclosure obligations set forth by the SEC in Form N-1A.

16  And aside from her unsupported claim that the APF was 75 Bps,[9] she does not claim that the

17  class period Registration Statements or Prospectuses omitted any of the total costs borne by

18  investors in connection with the purchase, sale, or holding of Fund shares.  There is no question

19  that the Prospectuses disclosed in detail the total management and distribution fees charged

20  against the Funds by WM Advisors and WM Distributor, respectively.  (*See, e.g.,* Escobar Decl.,

21  Ex. F at 5-14.)  There is also no question that the SEC's Form N-1A does not require disclosure

22  of the information Ms. Dumdie alleges was improperly omitted from the Prospectuses she

23  alleges to be false.  *See In re Morgan Stanley & Van Kampen Mutual Fund Sec. Litig.*, No. 03

24  Civ. 8208 RO, 2006 WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006).  Indeed, the Director of the

25

26  [9] Ms. Dumdie's argument that the APF was 75 Bps and was not adequately disclosed in the Funds' public filings is addressed in Section IV.C, *infra*.



1   SEC's Division of Investment Management expressly confirmed this in testimony before

2   Congress in 2003, when the SEC was considering legislation (never enacted) to mandate further

3   disclosure.  (Paul Roye, *Testimony Concerning the Mutual Funds Integrity and Fee*

4   *Transparency Act of 2003*, at 6 (June 18, 2003), *available at*

5   www.sec.gov/news/testimony/061803tspfr.htm ("'Revenue-sharing payments are not a fund

6   expense because they are made from the adviser's own resources, rather than fund assets.  As a

7   result, mutual funds are not required to disclose these payments."), attached at Escobar Decl.,

8   Ex. G at 7.)  "The current SEC regulations impose no duty on defendants to disclose the

9   allocation of broker compensation. . . .  [Form N-1A] does not require disclosure of how

10   differential compensation is allocated.  Nor does it require disclosure of sales contests or

11   management bonuses."  *Morgan Stanley*, 2006 WL 1008138, at *7; *see also Benzon,* 420 F.3d at

12   612 ("Current SEC regulations, including Form N1-A, do not impose a disclosure obligation

13   with respect to broker compensation."); *Hoffman v. UBS-AG*, No. 05 Civ. 6817 (LBS), 2008 WL

14   4684168, at *6 (S.D.N.Y. Oct. 22, 2008) (dismissing fraud claims premised on failure to disclose

15   compensation paid to brokers in excess of 12b-1 fees where defendant's prospectus disclosed the

16   types of  additional compensation that "may be spent" on brokers).  In short, Ms. Dumdie cannot

17   allege, as a basis for either her Securities Act or her Exchange Act claims, that the Funds had a

18   duty to disclose the allegedly omitted information in the Registration Statement or Prospectus.[10]

19

20   _____

[10] As referenced in the SAC, the SEC has *proposed* a rule that would have changed the disclosure requirements for

21   revenue-sharing programs.  (*See Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to Registration From for Mutual Funds*, Release Nos. 33-8358, 34-49148, IC-26341, 59 Fed. Reg.

22   6438 (Feb. 10, 2004) (cited in the SAC ¶ 12) attached at Escobar Decl., Ex. H.)  This was merely a proposed rule during the entire Class Period, and remains so today.  "Proposed rules that have yet to be adopted have no force at

23   law.  The possible imposition of a duty of disclosure after the fact does not support a cognizable securities fraud claim."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

24   Furthermore, Plaintiff's vague quotation of SEC official Linda Chatman Thomsen's press release about an enforcement proceeding not involving Defendants, but other parties under different facts, is irrelevant to this

25   litigation.  (SAC ¶ 12.)  Further, the statement Plaintiff quotes concerned a *non-litigated, administrative settlement*. Such settlements are not, and cannot be, legal precedent, as they have neither been tested by the adversary system

26   nor subjected to judicial scrutiny.  *See Morgan Stanley*, 2006 WL 1008138, at *5.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1

2

### B. The Prospectuses Accurately and Adequately Disclosed the Revenue-Sharing Arrangement

3      Since there is no statutory disclosure requirement, Ms. Dumdie's claims fail unless she

4      can allege an affirmative material misstatement in the Prospectuses and Registration Statements,

5      or that the omission of certain material facts rendered an affirmative statement misleading. *See*

6      *Benzon*, 420 F.3d at 611–12.  Under Rule 9(b), this means that she is required to allege facts

7      providing "an explanation as to why the statement or omission complained of was false or

8      misleading." *In re Stac Elec. Sec. Litig.*, 89 F.3d at 1404.  The SAC falls well short of the

9      minimum pleading standard.

10      The SAC's core allegation concerns a semantic quibble, not a material misstatement:

11      that the Funds' Prospectuses provided inadequate disclosure when they stated that the

12      investment advisors "may" make payments to broker-dealers when, in fact, WM Advisors and

13      WM Distributor had already entered into some revenue-sharing arrangements.  (SAC ¶ 10.)  But

14      a complaint founded on allegations of securities fraud must be dismissed where, as here, "the

15      allegedly omitted or misrepresented information was in fact appropriately disclosed." *See White*

16      *v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991); *see also In re Keyspan Corp. Sec. Litig.*, 383

17      F. Supp. 2d 358, 377 (S.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate

18      where the complaint is premised on the nondisclosure of information that was actually

19      disclosed").

20      Defendants expressly disclosed the allegedly hidden incentive fees in every Registration

21      Statement during the class period, and either attached or incorporated by reference an exhibit

22      entitled the "Form of Dealer Agreement" between both WM Distributor and WM Advisors and

23      selling broker-dealers.  The "Form of Dealer Agreement" identified the specific terms under

24      which WM Advisors made incentive payments to broker-dealers for selling shares of the WM

25      Strategic Asset Management Portfolios:

26

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1

2

3

4

5

6

7

> Whereas WM Advisors, Inc. recognizes that it will benefit from the sale of Shares of WM Strategic Asset Management Portfolios, LLC, WM Advisors, Inc. hereby agrees to pay to Selling Broker-Dealer, with respect to Shares of WM Strategic Asset Management Portfolios, LLC, a fee accrued daily and payable monthly at the annual rate of 0.50% (0.25% for Class C Shares) of the average daily net assets of such Shares held by Customers for whom Selling Broker-Dealer is the dealer of record, which fee is in addition to any dealer allowance, Sales Commissions and/or service fees payable by WMFD as set forth above.  WM Advisors reserves the right to change the amount of, or to cease paying, this fee upon fifteen (15) days prior written notice to Selling Broker-Dealer.

8  (Escobar Decl., Ex. I at 13.)  In fact, the Form of Dealer Agreement and 50 Bps APF had been

9  publicly disclosed by the Funds by at least the year 2000.  (Escobar Decl., Ex. J at 8.)  Thus,

10  there can be no legitimate dispute that the Funds' Registration Statements at issue disclosed the

11  revenue sharing program long before the start of the putative class period.

12  The Court can and should rely upon these publicly filed documents, which are referenced

13  in the SAC itself, in determining that the SAC's claims have no merit as a matter of law.  *See In*

14  *re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625 (JG), 2007 WL 1213395, at *7 (E.D.N.Y.

15  Apr. 25, 2007) (holding that the court "may consider publicly available documents—such as

16  prospectuses and SAIs—relied upon or referenced in the complaint"); *Whirlpool Fin. Corp. v.*

17  *GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) (holding that "a reasonable investor is

18  presumed to have information that is in the public domain") (quoted in *Berry v. Valence Tech.,*

19  *Inc.*, 175 F.3d 699, 703, n.4 (9th Cir. 1999)).  Moreover, the SEC expressly confirms that mutual

20  funds need not include all publicly disclosed information in the prospectuses, and instead

21  expressly authorizes funds to disclose certain information in the prospectuses, while disclosing

22  other information only in other parts of the registration statement.  (*See* Escobar Decl., Ex. K at

23  7-8 (Form N-1A and instructions).)

24  As in the *Zapien* action, Plaintiff here will likely counter that Defendants misled

25  investors by stating that WM Distributor "may, from time to time," make incentive payments to

26

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1  broker-dealers when, in fact, WM Distributor was already making such payments.  (SAC ¶ 10.)

2  But this argument fails for at least two reasons.

3      First, Ms. Dumdie's argument fails as a matter of law because the statements about

4  which she complains did not suggest that there were no revenue-sharing arrangements.  *See*

5  *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1007 (9th Cir. 2002) (public statement held

6  not materially misleading where it did not create false impression).  To the contrary, all of the

7  Prospectuses and Registration Statements put Plaintiff and potential class members on notice of

8  the possibility of such arrangements.  *See Benzon*, 420 F.3d at 612; *see also AIG*, 2007 WL

9  1213395, at *8 n.15.  For exactly this reason, both the Sixth Circuit Court of Appeals and courts

10  in the Southern District of New York have *rejected* the very contention Ms. Dumdie attempts to

11  advance in this case—that it is materially misleading to state that a program possibly

12  encouraging brokers to sell particular mutual funds "may" exist when it does exist.  *Benzon*, 420

13  F.3d at 612; *Hoffman*, 2008 WL 4684168, at *6; *AIG*, 2007 WL 1213395, at * 8 n.15.

14      Applying the exact same legal standards that control in this circuit, the Sixth Circuit held

15  that the difference between a disclosure that dealers "may" receive sales incentives and one

16  confirming that they "do" receive such incentives is merely "a semantic quibble."  *Benzon*, 420

17  F.3d at 612.  The *Benzon* court explained:

18   
19          If anything, the inclusion of this statement in the prospectus
   (which, again, was not mandated by any current SEC regulation)
   served to put prospective investors on notice that there was a
20          possibility that brokers were being compensated more highly for
   the sale of certain class shares than others, such that investors
   could pursue that line of inquiry with their financial advisors if
21          they were concerned about broker incentives.

22  *Id.*  Judge Gleeson of the Southern District of New York agreed, rejecting the same argument

23  that "may" language is misleading in the context of mutual fund incentive programs.  *AIG*, 2007

24  WL 1213395, at *8 n.15.

25      Plaintiff also challenges as supposedly misleading the Prospectuses' statements that

26  certain payments were at the expense of WM Distributor and WM Advisor, merely because WM

MOTION TO DISMISS - 12
No. C-08-1251 MJP

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1   Distributor and WM Advisor ultimately traced their revenues to fees paid to them by the Funds.

2   (SAC ¶ 66.)  Nonsense.  The Prospectuses and Registration Statements fully disclose that WM

3   Distributor derives its revenue from fees paid to it by the Funds.  (*See* Escobar Decl., Ex. F at

4   12-13.)  The purportedly omitted fact under Plaintiff's strained argument—that any payment

5   made by WM Distributor or WM Advisor must come from sums that can be ultimately traced

6   back to fees paid to them from the Funds—is obvious from the express language of the

7   Prospectuses and Registration Statements.  The fact that WM Distributor or WM Advisor chose

8   to spend a portion of the fully disclosed fees they received from the Funds on payments to

9   broker-dealers does not make those payments any less "at [their] expense"; for example, they

10  could choose not to make those payments and yet retain the entire fee they receive from the

11  Funds.  (*See, e.g.,* Escobar Decl., Ex. F at 13 (noting that even if fees paid to WM Distributor

12  exceed WM Distributor's expenses, WM Distributor may keep the entire fee).)  When testifying

13  before Congress, then Director of the SEC's Division of Investment Management Paul Roye

14  used almost the same terms as those challenged by Plaintiff to explain why mutual funds were

15  not required to disclose their investment advisors' revenue-sharing arrangements, even though

16  such advisors, just like mutual fund distributors, ultimately trace their revenue to fees paid by the

17  mutual funds from investment principal.  As Mr. Roye explained, "'Revenue-sharing payments

18  are *not a fund expense* because they are made from the adviser's *own resources, rather than fund*

19  *assets.*"  (Escobar Decl., Ex. G at 7 (emphasis added).)

20          Second, in this case, not only was the term "may" not misleading, it was accurate.  The

21  Form of Dealer Agreement during the class period stated that "WM Advisors reserves the right

22  to change the amount of, or to cease paying, this fee upon fifteen (15) days prior written notice

23  to Selling Broker-Dealer."  (Escobar Decl., Ex. I at 13.)  Mutual fund prospectuses and

24  registration statements, however, may be effective for as long as 16 months and are usually

25  updated only once per year.  *See* 15 U.S.C. § 77j(a)(3) (prospectus must not use information

26  more than 16 months old); 17 C.F.R. § 270.8b-16 (SEC rule requiring annual amendment of

MOTION TO DISMISS - 13
No. C-08-1251 MJP

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1   mutual fund registration statement, within 120 days of fiscal year end).  WM Distributor could

2   enter into different arrangements with different selling dealers, and was not mandated to provide

3   "additional compensation" to all of them.  Given the fact that the Funds' Prospectuses and

4   Registration Statements could outlast the revenue-sharing arrangements in place at the time

5   those documents were publicly filed, the term "may" was more accurate than more static terms

6   such as "do" or "will."  Thus, the SAC's claims must be dismissed because Defendants actually

7   (and accurately) disclosed the information alleged by Ms. Dumdie to be concealed or misstated.

8        If the arguments in *Zapien* are any indication, Ms. Dumdie will urge that these claims

9   are supported by *Siemers v. Wells Fargo & Co.*, in which a district court in San Francisco

10  allowed fraud claims based on "may" language to survive the pleading stage.  *Siemers v. Wells*

11  *Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at *5 (N.D. Cal. Aug. 14, 2006).  But

12  *Siemers* is distinguishable on its facts.  Unlike here, the defendants in *Siemers* never disclosed

13  the full nature of the revenue-sharing arrangement in the registration statement or SAI.  *Id.*, at

14  *5-*6.  In addition, unlike here, the plaintiffs in *Siemers* alleged that Wells Fargo mutual fund

15  advisers caused the funds' portfolios to be traded through Wells Fargo's broker-dealers at

16  inflated commission rates, thus guaranteeing the broker-dealers a steady flow of commission

17  revenue (known as "directed brokerage") that was not disclosed to investors.  *Id.*, at *3.  There

18  are no allegations of directed brokerage here.

19       In sum, the "may" language was appropriate, not misleading—both as a matter of law

20  and based on the flexible nature of the incentive program.  Any ambiguity, whether real or

21  imagined, was cured by the additional details disclosed in each of the Registration Statements

22  and their exhibits.  For all of these reasons, the SAC must be dismissed because it fails to plead a

23  material misstatement or omission with particularity.

24

25

26

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1

2

### C.   Defendants Did Not Misstate or Omit the Amounts of Their Advisor Paid Fees

3      Ms. Dumdie has embellished the Complaint with an additional allegation that contradicts

4 earlier versions of the *Zapien* complaints and all of the Funds' public disclosures, which all

5 stated that the **total** compensation to brokers was a 25 Bps 12b-1 fee from WM Distributors and

6 a potential 50 Bps APF from WM Advisors.  Plaintiff alleges that the APF was really 75 Bps.

7 (SAC ¶ 4.)  The sole support for this allegation is a marketing document that explains that the

8 "**Total** Fee Income" to brokers for the sale of Portfolios funds is "75 Bps."  (SAC Ex. A

9 (emphasis added).)  Pointedly, the document on which Plaintiff relies does not say that the APF

10 is 75 Bps.  The marketing piece is targeted to the broker-dealer community and simply sets forth

11 the total fees that could be earned by selling the Funds:  75 Bps.  Since broker-dealers could earn

12 a 25 Bps 12b-1 fee and a potential 50 Bps APF, this summary marketing document was both

13 accurate and consistent with Defendants' more particularized disclosure of these fees.  Plaintiff's

14 reading of this marketing document is completely untenable since it implies that the total fee

15 income available to broker-dealers is 100 Bps, something that contradicts the face of the

16 document and all public disclosures.  Plaintiff fails to point to any other support for her

17 allegation that the APF itself was 75 Bps.  Rank speculation does not support an adequate

18 allegation of securities fraud.  *See Bell Atlantic Corp.,* 127 S. Ct. at 1974 (pleading must nudge

19 claims beyond the conceivable to the plausible).  Here, Plaintiff's proposed reading of the

20 marketing document is facially implausible and contradicts the actual, specific disclosure of the

21 components of the total fees that could be earned by broker-dealers selling the Funds.  The Court

22 is not required to accept this alleged "fact" at the pleading stage.  *Steckman*, 143 F.3d at 1295–96

23 (holding that a court is not required to accept facts in the complaint that contradict facts in

24 documents referred to in the complaint).

25

26

**V.**     <u>**THE SAC DOES NOT ALLEGE SCIENTER WITH PARTICULARITY**</u>

To adequately plead scienter under the PSLRA for its Section 10(b) claim, the SAC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the Ninth Circuit, a plaintiff must "show that defendants engaged in 'knowing' or 'intentional' conduct." *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (referencing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 975) (noting that reckless conduct may also meet this standard if "it reflects some degree of intentional or conscious misconduct"…[or] "deliberate recklessness."). A plaintiff must plead specific allegations as to **each** defendant's state of mind. *See Fouad*, 2008 WL 5412397, at *8; *see also In re New Century*, ___ F. Supp. 2d ___, No. CV 07-00931 DDP (JTLx), 2008 WL 5147991, at *13 (C.D. Cal. Dec. 03, 2008) (stating that the majority of reported district court cases in the Ninth Circuit hold that the group pleading doctrine is no longer viable).

As the Supreme Court explained in *Tellabs, Inc.*, to "qualify as 'strong' … an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 127 S. Ct. at 2504–05. This standard requires the SAC to raise a strong inference of "scienter—i.e., a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud." *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (internal references omitted). In making this determination, courts must engage in a "holistic" review of the allegations that analyzes whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 127 S. Ct. at 2511 (emphasis in original); *see also South Ferry*, 542 F.3d at 784. When conducting this holistic review, the court must take into account plausible opposing inferences, and "only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners LLC*, 2009 WL 57081, at *5 (holding that Ninth Circuit courts should conduct a dual inquiry to first

1    determine whether any allegation standing alone sufficiently alleges scienter before conducting

2    the holistic review of the same allegations).

3        Under either prong of the dual inquiry espoused by the Ninth Circuit in *Zucco Partners*,

4    the SAC has failed to allege facts giving rise to a strong inference of scienter because each of the

5    facts in the SAC is more plausibly explained by a proper motivation.  As a result, the SAC fails

6    to supply the Court with any inference of scienter that is as cogent and at least as compelling as

7    any opposing inference of nonfraudulent intent.  We debunk each scienter allegation individually

8    before explaining why they also fall short collectively.

9        **A.    The "Evolution" and "Minimize Potential Liability" Allegations Support No
10              Inference of Scienter**

11       First, the SAC claims that scienter is shown because the "fact that the disclosures came

12   after the Steering Programs were put in place and evolution of the purported disclosures over

13   time demonstrate that the Registrants intentionally sought to disclose as little information as

14   possible about the Steering Programs."  (SAC ¶ 62.)  Moreover, the SAC claims that Defendants

15   only disclosed additional information about the revenue-sharing program in 2004 "in a

16   transparent and belated attempt to 'clean up' their disclosures and minimize their potential

17   liability" following "the illegal activities and scandals in the mutual fund industry."  (SAC ¶ 68.)

18   This allegation is nothing more than pleading "fraud by hindsight," a practice that has been

19   universally condemned.  *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 37 (1st Cir. 2002);

20   *Teachers' Retirement Sys. v. Hunter*, 477 F.3d 162, 183 (4th Cir. 2007), *see also In re Vantive*

21   *Corp. Sec. Litig.*, 283 F.3d 1079, 1084–85 (9th Cir. 2002) ("The purpose of the [Reform Act's]

22   heightened pleading requirement was generally to eliminate abusive securities litigation and

23   particularly to put an end to the practice of pleading 'fraud by hindsight.'").  That the Registrants

24   further refined their earlier disclosures of the APF and revenue-sharing program beginning in

25   2004 says nothing about any Defendant's state of mind with respect to the earlier Prospectuses

26   on which Plaintiff's claims are based.  Plaintiff was required to allege facts creating a strong

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1    inference that the Registrants knew or must have known that the statements were materially

2    misleading *when the statements were made*.  She has not done so.

3            The Registrants slightly modified the 2004 Prospectus by moving the disclosure of the

4    APF's amount (50 Bps) from the SAI to the Prospectus.  (SAC ¶ 54.)  The Registrants made

5    additional modifications to this disclosure in the December 30, 2004 revised Registration

6    Statement and final February 27, 2005 version—both publicly filed with the SEC.  (Escobar

7    Decl., Ex. L at 19-20, 22-23; SAC ¶ 56 (language in 2005 Prospectus).)  These refinements,

8    which built on the disclosures in the earlier Registration Statements and added additional details,

9    further demonstrate Defendants' efforts to adjust the Funds' disclosures in a shifting landscape.

10   Given that an SEC spokesperson refused to criticize even the early iterations of the disclosure

11   employed here, despite the fact that the SEC was in 2004 (and still is) in the midst of its

12   rulemaking process for increased disclosures of mutual fund fee allocation, Defendants were

13   reasonable in their belief that the law did not require further disclosure at the time they filed the

14   Registration Statements in question.  *See In re Morgan Stanley & Van Kampen*, 2006 WL

15   1008138, at *11; *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL

16   342050, at *8 (S.D.N.Y. June 25, 1998); *Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F.

17   Supp. 2d 233, 238 (S.D.N.Y. 2006) (holding that mutual funds are not required to disclose the

18   allocation of a portion of the total fees to pay for "shelf-space" programs); *see also* Escobar

19   Decl., Ex. G at 7 (noting that revenue-sharing arrangements need not be disclosed in mid-2003).

20   Though around the time that the Funds filed the 2004 Registration Statement, Congress and the

21   SEC considered enacting new laws requiring additional disclosures for revenue-sharing

22   arrangements, no such laws were yet enacted.  (*See generally* Escobar Decl., Ex. G (testimony

23   before Congress regarding potential federal legislation); Ex. H (proposed SEC regulation).

24   Indeed, both the Sixth Circuit and courts in the Southern District of New York have found no

25   material inaccuracy in similar mutual fund prospectus disclosures stating that brokers "may"

26   receive additional compensation.  *Benzon*, 420 F.3d at 612; *AIG*, 2007 WL 1213395, at *8 n.15.

MOTION TO DISMISS - 18
No. C-08-1251 MJP

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1   This strongly supports that Defendants in this case acted reasonably and without fraudulent

2   intent when they decided to provide additional information about the APF in response to pending

3   legislation and potential new SEC rules.  Going above and beyond the required level of

4   disclosure does not suggest scienter.

5          **B.      The SAC Offers No Factual Support For Its Allegations Concerning the So-
                      Called Cerulli Report**
6

7          The SAC also tries to establish scienter by making the unsupported allegation that

8   Defendant Papesh commissioned a third-party consultant to the mutual fund industry, Cerulli

9   Associates, to prepare a report on the APF only to disregard its conclusion that the APF was

10  "highly problematic and should be discontinued immediately."  (SAC ¶ 63.)  Ms. Dumdie has

11  not offered any particularized facts to support this allegation.  She has not attached the report

12  itself, nor has she cited corroborating statements from a confidential witness or any other source

13  to bolster her bare assertion about the alleged report.  Indeed, Ms. Dumdie's allegations

14  concerning the purported Cerulli Report imply that she received this (mis)information from a

15  third-party source, but she supplies absolutely no supporting evidence to test the allegations'

16  reliability.  This type of pleading is completely insufficient to give rise to a strong inference of

17  scienter under the PSLRA.  *Cf. Zucco Partners*, 2009 WL 57081, at *9–10 (holding that

18  confidential witnesses must be described with sufficient particularity to establish their reliability

19  and personal knowledge).

20         **C.      The SAC's Misinterpretation of the Broker-Dealer Brochure Also Does Not
                     Support an Inference of Scienter**
21

22         The SAC also misplaces its reliance on the broker-dealer marketing document to prove

23  scienter.  (*See* SAC ¶ 64.)  As explained above in Section IV.C, this document simply confirms

24  that the total fees payable to broker-dealers was 75 Bps, not that the APF was 75 Bps.  Since

25  broker-dealers were eligible to receive 25 Bps in 12b-1 fees and 50 Bps in APF, the SAC's

26  allegations on this point do not enhance Plaintiff's scienter argument.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1

**D.      The SAC's Motive Allegations Do Not Create a Strong Inference of Scienter**

2       The SAC's motive allegations also do not create a strong inference of scienter.  The SAC

3   claims that the fact that Defendants had "the Steering Program(s) in place indicates that the

4   Registrants know and believe that such Programs drive and increase sales."  (SAC ¶ 65.)  It also

5   alleges that "the Registrants, the WM Advisor and WM Distributor reaped huge profits from the

6   Steering Programs and had an incentive to keep them secret."  (*Id.* ¶ 67.)  The trouble with these

7   allegations, however, is that the economic incentive for brokers to sell the WM Portfolios Funds

8   was disclosed in all of the Registration Statements during the class period.  *See Castillo*, 1998

9   WL 342050, at *10 (rejecting motive allegations where plaintiffs pointed to no motive other than

10  economic gain that was disclosed in the prospectus).  Thus, these allegations that Defendants

11  were motivated to make misstatements to conceal the revenue-sharing program are absurd on

12  their face because the economic incentive was disclosed.[11]

13

**E.      A Holistic Review of These Allegations Creates an Equally Feeble Inference
         of Scienter**

14

15      Viewing these feeble scienter allegations collectively brings the SAC no closer to

16  satisfying the *Tellabs* standard.  To the contrary, the sum of the innocent inferences far

17  outweighs an inference of fraudulent intent:  (1) the Funds' disclosures complied with the laws

18  governing such disclosures that were in force at the time (and are still in effect); (2) when

19  Congress and the SEC considered changing these laws to require more fulsome disclosures,

20  Defendants stayed ahead of the curve by providing greater detail about the Funds' revenue

21  sharing program *long before* any stricter disclosure laws could go into effect; (3) the broker-

22  dealer marketing supports Defendants' disclosure of the 75 Bps of total fees available; (4) the

23  Cerulli Report allegation is completely unsubstantiated; and (5) the SAC's motive allegations are

24  ineffective because the economic incentive created by the revenue-sharing program was fully

25  ───────────────

26  [11] Even if the SAC had made coherent allegations on this subject, allegations of motive and opportunity to defraud, without more, are generally insufficient to satisfy the PSLRA's requirements for pleading scienter.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 974.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1   disclosed.  Thus, under either prong of the *Zucco Partners* dual inquiry, the SAC fails to plead

2   scienter with particularity and its Section 10(b) claim must therefore be dismissed.

3       **F.    The SAC Also Fails to Meet the Pleading Standard of Rule 9(b) and the
                PSLRA as to the Independent Directors**

4

5           In addition, Plaintiff fails to set forth her allegations against the Independent Directors

6   with the precision, specificity, and particularity necessary to state a fraud claim in the Ninth

7   Circuit.  Instead, Plaintiff offers only conclusory statements, sounding in fraud and asserted

8   against all Defendants as a group, that fall short of the heightened pleading standard of Rule 9(b)

9   of the Federal Rules of Civil Procedure, as well as the PSLRA.

10          To comply with Rule 9(b), a complaint sounding in fraud "must provide allegations that

11  are specific enough to explain what about the defendant's conduct is false or misleading, so that

12  the defendant can formulate a specific denial." *Pennsylvania Ave. Funds v. Borey*, No. C06-

13  173RAJ, 2008 WL 426509, at *2 (W.D. Wash. Feb. 13, 2008).  A fraud claim must (1) state

14  precisely the time, place, and nature of the specific acts of fraud, (2) state the reasons why each

15  specific act is misleading and (3) set forth particular facts that give rise to a strong inference that

16  the defendant acted with the required state of mind.  *In re Oak Tech. Sec. Litig.*, No. 96-20552

17  SW, 1997 WL 448168, at *3 (N.D. Cal. Aug. 1, 1997).  To satisfy the "state of mind"

18  requirement for securities fraud, a complaint must "show that defendants engaged in 'knowing'

19  or 'intentional' conduct." *South Ferry LP*, #2, 542 F.3d at 782 (referencing *In re Silicon

20  Graphics Inc. Sec. Litig.*, 183 F.3d at 975) (noting that reckless conduct may also meet this

21  standard if "it reflects some degree of intentional or conscious misconduct"…[or] "deliberate

22  recklessness.").

23          The PSLRA imposes an even higher burden on a plaintiff seeking to plead violation of

24  federal securities law. *Pennsylvania Ave. Funds*, 2008 WL 426509, at *2.  The PSLRA requires

25  a plaintiff to "specify each statement alleged to have been misleading, and, if an allegation

26  regarding the statement or omission is made on information and belief, the complaint shall state

MOTION TO DISMISS - 21
NO. C-08-1251 MJP

1   with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  In the

2   Ninth Circuit, the PSLRA is viewed as the "death knell for the 'customary latitude' a court

3   affords a complaint in considering a motion to dismiss." *Pennsylvania Ave. Funds*, 2008 WL

4   426509, at *2 (citing *Gompper v. Visx, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002)).

5       Plaintiff's generalized allegations of fraud against the Independent Directors fail to meet

6   any of the Rule 9(b) or PSLRA requirements.  In her Complaint, Plaintiff alleges generally that

7   all Defendants failed to make certain disclosures and that "defendants . . . knew at the time they

8   were issuing statements that the statements contained false and misleading information and thus

9   lacked any reasonable basis for making them."  (SAC ¶¶ 61, 69.)  Ninth Circuit courts have held

10  that similar conclusory statements that fail to list specific acts or statements of fraud, or offer any

11  facts pertaining to the defendant's state of mind or any possible motive, do not meet the criteria

12  of Rule 9(b) and the PSLRA.  *See, e.g., Pennsylvania Ave. Funds*, 2008 WL 426509, at *4–5

13  (motion to dismiss granted for failure to comply with the PSLRA and Rule 9(b) when the

14  plaintiff failed to provide detailed facts to support its claims of the defendant's violation of

15  federal securities laws); *In re Oak Tech. Sec. Litig.,* 1997 WL 448168, at *3 (requiring plaintiff

16  to meet the particularity requirement of Rule 9(b) when alleging control person liability).

17      Plaintiff's allegations are also deficient because they are asserted generally against all

18  Defendants, each of whom has a different relationship to Plaintiff.  *See Swartz v. KPMG LLP*,

19  476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump

20  multiple defendants together but requires plaintiffs to differentiate their allegations when suing

21  more than one defendant and inform each defendant separately of the allegations surrounding his

22  alleged participation in the fraud."); *In re New Century*, 2008 WL 5147991, at *13.

23  Accordingly, Plaintiff's generalized and nonspecific allegations of fraud against the Independent

24  Directors fail to meet the standards of Rule 9(b) and the PSLRA and must be dismissed.

25

26

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1
2

## VI.   THE SAC FAILS TO PLEAD TRANSACTION CAUSATION WITH PARTICULARITY

3        The SAC's Section 10(b) claim must also be dismissed because it fails to plead reliance

4   (also known as transaction causation) with particularity.  Reliance is a required element of

5   Section 10(b) and Rule 10b-5 claims and it must be pleaded with particularity under Federal

6   Rule of Civil Procedure 9(b) and the PSRLA.  *See Basic Inc., et al., v. Levinson*, 485 U.S. 224,

7   243 (1988) (noting that reliance is a necessary element of a Rule 10b-5 cause of action); *Dura*

8   *Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th

9   Cir. 2005) ("It is well established that claims brought under Rule 10b-5 and section 10(b) must

10   meet the particularity requirements of Federal Rule of Civil Procedure 9(b).").

11        Nevertheless, under certain circumstances, securities plaintiffs are able to meet this

12   heightened pleading requirement for reliance by utilizing the "fraud on the market" theory.  This

13   theory allows reliance to be presumed where shares are traded in an *efficient* market, because in

14   an efficient market all available public information is factored into the stock's market price.  *See,*

15   *e.g., In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1187 (N.D. Cal. 2004).

16   When this presumption applies, plaintiffs need only show that they relied "on the integrity of the

17   price of the stock as established by the market, which in turn is influenced by information or the

18   lack of it."  *In re Van Wagoner Funds, Inc.*, 382 F. Supp. 2d at 1188 (citing *In re Convergent*

19   *Techs. Sec. Litig.*, 948 F.3d 507, 512 n.2 (9th Cir. 1991)).

20        Here, Ms. Dumdie must plead transaction causation with particularity because the "fraud

21   on the market" theory does *not* apply to securities fraud claims based on mutual funds.  As

22   numerous courts have explained, the "fraud on the market" theory is not available in the mutual

23   funds context because the price of mutual funds is not determined by the market and thus is not

24   affected by any alleged misrepresentations or omissions.  *See In re Van Wagoner Funds, Inc*.,

25   382 F. Supp. 2d at 1188  (holding that because the plaintiffs failed to plead "particular facts

26   establishing an efficient market and because a mutual fund share price is not determined by the

MOTION TO DISMISS - 23
No. C-08-1251 MJP

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1    market, but the underlying asset value," the plaintiffs had not properly pleaded "fraud on the

2    market reliance."); *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 613 (S.D.

3    Cal. 2007); *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998); *Clark v.*

4    *Nevis Capital Mgmt., LLC,* No. 04 Civ. 2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005).

5           Ms. Dumdie apparently concedes this reality because nowhere in the SAC does she claim

6    reliance on the Funds' NAV or the "fraud on the market" presumption.  Indeed, she even

7    acknowledges that critical and determinative differences exist between mutual funds and

8    corporate stock traded in an efficient market:  "A mutual fund company is very different from a

9    traditional corporation" and "mutual fund shares do not trade at a price set by the public market."

10    (SAC ¶¶ 70, 72.)  And because, as Ms. Dumdie admits, mutual funds are not traded "at a price

11    set by the public market," she may not rely upon the "fraud on the market" theory to presume

12    transaction causation for her securities fraud claims.  As a result, Ms. Dumdie must plead

13    reliance with particularity.[12]  This she has not done.

14           The SAC makes only one attempt to satisfy the reliance pleading requirement:  "Plaintiff

15    and members of the Class would not have purchased the WM Funds or paid the related

16    commissions and fees . . . had the existence or nature of the Steering Programs been disclosed."

17    (SAC ¶ 77.)  This conclusory allegation does not pass muster under the heightened pleading

18    requirements because it falls short of a statement that Ms. Dumdie actually read the Prospectuses

19    and Registration Statements and relied on them in making her purchase.  It fails to adequately

20    show that "but for the fraud, the plaintiff would not have engaged in the transaction at issue."

21    *See In re Daou Systems, Inc*., 411 F.3d at 1025.  It is not enough to merely assert that Ms.

22    Dumdie and the Class would not have purchased the Funds but for the fraud.  In *Van Wagoner*

---

23    [12] Indeed, even if the SAC survives Defendants' Motion to Dismiss—and it should not—Ms. Dumdie faces a steep

24    uphill battle at class certification because, without being able to rely on the "fraud on the market" presumption, individual questions of reliance will almost certainly predominate and the proposed class will fail.  *See, e.g., Oscar*

25    *Private Equity Inv. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 264 (5th Cir. 2007) ("This [fraud on the market] theory permits a trial court to presume that each class member has satisfied the reliance element of their 10b-5

26    claim.  Without this presumption, questions of individual reliance would predominate, and the proposed class would fail.").

1   *Funds*, a case also involving mutual funds, the court dismissed similarly worded allegations for

2   failure to plead reliance with particularity.  382 F. Supp. 2d at 1187–88.  Specifically, the *Van*

3   *Wagoner Funds* court found the plaintiffs' allegations lacking because they did not allege that

4   the plaintiffs had actually read the annual reports or registrations statements and relied on them

5   when purchasing the mutual funds at issue.  *Id.*; *see also Clark*, 2005 WL 488641, at *18

6   (dismissing a fraud claim in the mutual funds context because the plaintiff did not allege direct

7   reliance upon the misrepresentations or omissions alleged in the mutual funds context).  Here,

8   the SAC's failure to plead anything but a conclusory allegation of reliance is fatal to

9   Ms. Dumdie's claims. As a result, her Section 10(b) claim (Count IV) must be dismissed for this

10  separate and additional reason.

11  **VII.   PLAINTIFF FAILS TO PROPERLY PLEAD DAMAGES AND LOSS**
12  **        CAUSATION**

13          **A.        The SAC Has Not Alleged Damages to Support the Securities Act Claims**

14          Ms. Dumdie's Securities Act claims are also deficient because she has failed to plead that

15  she suffered recoverable damages, which in this context must take the form of an out-of-pocket

16  loss resulting from depreciation in the Funds' value.  Sections 11 and 12(a)(2) of the Securities

17  Act allow only for recovery of depreciation in value of the subject security.  *See* 15 U.S.C.

18  §§ 77k(e), 77l(a)(2), (b); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp.

19  2d 243, 253–54 (S.D.N.Y. 2003); *In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 845, 866–67

20  (D. Md. 2005).  If the Funds have instead appreciated in value between the time of their

21  acquisition during the class period and when they were sold (or if not sold, at the time of suit),

22  then there can be no recovery under the Securities Act.  *See In re Mutual Funds Inv. Litig.*, 384

23  F. Supp. 2d at 867 (dismissing Section 11 and 12 claims because plaintiffs failed to allege that

24  they did sell, or could have sold at the time of suit, their shares for an amount less than they

25  paid).

26

1    Here, Ms. Dumdie merely alleges that she sustained damages as a result of the purported

2    violations of the Securities Act, but nowhere alleges that her shares in the Funds depreciated in

3    value following her acquisition.  (SAC ¶¶ 16, 70–78.)  To the contrary, all but one of the Funds

4    purchased by Ms. Dumdie increased in value during the class period.  (Escobar Decl., Exs. M,

5    N.)  And because Ms. Dumdie has not alleged that she sold her shares in the Funds at a loss, or

6    could have sold them at a loss at the time of filing suit, her Securities Act claims are deficient

7    and should be dismissed.  *See In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d at 867.

8         **B.    Plaintiff Has Not Alleged Loss Causation on the Exchange Act Claims**

9    The SAC also fails to plead "loss causation"—that some acts or omissions by Defendants

10   actually caused the alleged losses that Ms. Dumdie seeks to recover.  *See Dura Pharms., Inc. v.*

11   *Broudo*, 544 U.S. 336, 341 (2005).  To properly plead loss causation, Ms. Dumdie must link her

12   alleged losses not merely to her ownership of the Funds, but also to the purported failure to

13   adequately disclose the incentive arrangement.  *See id.*; *see also Metzler Inv. GMBH*, 540 F.3d at

14   1063 ("the complaint must allege that the practices that the plaintiff contends are fraudulent …

15   caused the resulting losses"); *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1054, 1057–58

16   (9th Cir. 2008) (requiring causal connection between disclosure of alleged fraud and plaintiff's

17   alleged loss).  Ms. Dumdie does not adequately allege such a link.

18   A mutual fund's price is determined by the "net asset value" ("NAV") of the fund.  (SAC

19   ¶ 72.)  The NAV is calculated by subtracting the mutual fund's liabilities, such as fees and

20   commissions, from its assets.  *See In re Morgan Stanley & Van Kampen*, 2006 WL 1008138, at

21   *9 (listing the formula for calculating NAV).  In the context of mutual funds, loss causation

22   requires the SAC to allege that the NAV would have been higher had the Funds more fully

23   disclosed the incentive arrangement.  *See Castillo v. Dean Witter Discover & Co.*,1998 WL

24   342050, at *5 (rejecting theory that failure to disclose that a portion of certain mutual fund fees

25   was paid to brokers as an incentive for selling shares could cause plaintiffs' loss).  But, as

26   explained in *Castillo*, any decline in the NAV relates "to the success of the investment strategies

MOTION TO DISMISS - 26
No. C-08-1251 MJP

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1   of that fund ... and bears no relationship to the compensation arrangements of the brokers." *Id*.

2   Put differently, only the total fees charged—not their allocation—impacts NAV.  *See id.*; *In re*

3   *Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *9.  Thus, whether or not the various

4   Prospectuses and Registration Statements fully disclosed the allocation of these fees, and

5   regardless of whether the fee-sharing arrangements were in place or not, the Funds' NAV could

6   only be impacted by the total fees charged to the Funds.  And because these fees were disclosed

7   in full detail, Ms. Dumdie's only theory for loss causation is that the allocation of the fees

8   "reduce[d] the price at which the fund's shares are bought and sold."  (SAC ¶ 71.)  This

9   allegation, however, is incorrect as a matter of law and cannot establish loss causation.  *See In re*

10  *Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *9 (holding plaintiff's claim that value

11  of mutual fund shares would have been less if incentive fees to brokers were disclosed is

12  "incorrect as a matter of law"); *Castillo*, 1998 WL 342050, at *5–6.

13  **VIII.   PLAINTIFF FAILS TO PLEAD "SCHEME LIABILITY" UNDER RULE 10B-5**

14          To the extent the SAC relies on a theory that the Registrants and Principal Investors Fund

15  engaged in a "scheme to defraud" investors in violation of Rule 10b-5(a) and (c) (*see* SAC

16  ¶ 123) to state its Section 10(b) claim against them, this theory collapses for failure to plead a

17  fraudulent scheme and failure to plead reliance on the scheme.

18          A complaint cannot adequately allege "scheme liability" under Rule 10b-5(a) and (c)

19  unless it pleads specific facts showing that a defendant engaged in a "deceptive act," meaning a

20  transaction or conduct that had "the *principal purpose and effect* of . . . creat[ing] the false

21  appearance of fact" in connection with the purchase or sale of a security.  *See Simpson v. AOL*

22  *Time Warner Inc.*, 452 F.3d 1040, 1048–50 (9th Cir. 2006), *vacated on other grounds*.  The SAC

23  pleads no such facts for this makeweight argument.  *In re Ditech Networks, Inc. Deriv. Litig.*,

24  No. C 06-5157 JF, 2007 WL 2070300, at *6 (N.D. Cal. July 16, 2007) (dismissing scheme

25  liability claim for failure to plead the fraudulent conduct with particularity).  In addition, as the

26  Supreme Court recently held in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1   761 (2008) there can be no "scheme" liability under 10b-5 without a showing that plaintiff

2   actually relied upon the scheme in connection with the purchase or sale decision.  Here, the

3   claims of the SAC are premised upon the allegedly incomplete disclosure of broker

4   compensation.  As pointed out elsewhere, the nature and total amount of such compensation was

5   disclosed and the misrepresentation and omission claims consequently fail.  Invoking the

6   alternative of "scheme" liability does nothing to correct this deficiency.  Moreover, as discussed

7   *supra* in Section VI, there is no allegation that Plaintiff specifically relied upon the Prospectuses

8   at issue in making her purchases of the Funds.  For these reasons, a "scheme" liability theory

9   does not help Plaintiff.

10  **IX.    THE COMPLAINT MUST BE DISMISSED BECAUSE ITS CLAIMS ARE STALE**

11          Every one of the SAC's claims is time-barred by the statute of limitations, statute of

12  repose, or both.[13]  As described below, the Funds' public disclosures throughout the Class

13  Period placed reasonably diligent investors on inquiry notice beginning on February 28, 2002, of

14  any claims.  Because the SAC was not filed until August 20, 2008, even the Section 10(b) claims

15  carrying the more generous two-year statute of limitations are stale by over four years.

16  Moreover, the applicable statutes of repose—which set outer limits for bringing an action,

17  irrespective of when an investor could have discovered her claim—further require that most of

18  the SAC's claims be dismissed.  Finally, Ms. Dumdie's reliance on the *Zapien* lawsuit to toll her

19  claims is not only incorrect, but also ineffective, because *Zapien* also was filed after the statutes

20  of limitations had expired.  Accordingly, this Court should dismiss the SAC in its entirety.

21          **A.    The SAC's Claims Are Time-Barred Because Ms. Dumdie and the Putative
22                  Class Were Placed on Inquiry Notice of the APF Long Before This Suit Was
                    Filed**

23          The SAC's claims under the Securities Act carry a one-year statute of limitations that

24  runs from the date of actual or inquiry notice.  *In re Stac Elec. Sec. Litig.*, 89 F.3d at 1411.  The

25

26  [13] *See Malone v. Clark Nuber, P.S.*, No. C07-2046 RSL, 2008 WL 2545069, at *5 (W.D. Wash. June 23, 2008)
     (explaining the difference between statute of limitations and statute of repose under federal securities laws).

1    Exchange Act claims are subject to a two-year statute of limitations from the date of actual or

2    inquiry notice.  28 U.S.C. § 1658(b).  Both statutes of limitations begin to run when a reasonable

3    investor should have been aware of the alleged fraud if exercising reasonable diligence.  *Betz v.*

4    *Trainer Wortham & Co., Inc.*, 519 F.3d 863, 876 (9th Cir. 2008).

5         Plaintiff was put on inquiry notice of her claims on February 28, 2002, when the Funds

6    filed a Registration Statement (including the Prospectus) with the SEC that told investors that

7    WM Advisors and WM Distributor may enter into revenue-sharing arrangements with broker-

8    dealers.[14]  (Escobar Decl., Ex. O at 23, 28.)  Ms. Dumdie alleges that she and the members of the

9    proposed class received all of the Class Period Prospectuses, including the 2002 Prospectus

10   (SAC ¶¶ 53, 55), and are thus charged with knowledge of these documents' contents throughout

11   the Class Period.  The 2002 Prospectus therefore put every Funds' purchaser on notice that WM

12   Advisors and WM Distributor may, at their own expense, pay additional fees to dealers for

13   selling the WM Portfolios Funds.  Moreover, the Funds' 2002 Registration Statement (of which

14   the Prospectus was a part) incorporated by reference an earlier-filed specimen "Form of Dealer

15   Agreement" between WM Distributor and WM Advisors and broker-dealers, specifically

16   disclosing the material terms under which WM Distributor and WM Advisors agreed to pay

17   broker-dealers in connection with sales of the Funds.  (Escobar Decl., Ex. J.)  In particular, the

18   "Form of Dealer Agreement" clearly listed that broker-dealers that sell shares in the WM

19   Portfolios Funds will receive an Advisor Paid Fee ("APF") of 50 basis points.  (*Id.* at 8.)  These

20   public disclosures started the clock on the statute of limitations for the SAC's claims.  *See, e.g.,*

21   *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1410 (S.D.N.Y. 1996) (holding that public

22

23   [14] The Funds filed their Registration Statement with the SEC on Form N1-A, which included the Funds' Prospectus,
     Statement of Additional Information ("SAI"), and other information concerning the Funds, including the Form of

24   Dealer Agreement.  (Escobar Decl., Ex. O at 29.)  The Prospectus, which was delivered to all purchasers, informed
     investors that additional information about the Funds was available through multiple sources.  (Escobar Decl., Ex. O

25   at 24, 27 ("You may . . . request other information about the WM Group of Funds . . . by contacting your financial
     advisor, by calling toll-free 1-800-222-5852, or by visiting www.wmgroupoffunds.com . . . [¶] You may also access

26   reports and other information about the Portfolios and Funds on the EDGAR database on the [SEC's] Internet
     website at http://www.sec.gov.").

MOTION TO DISMISS - 29
No. C-08-1251 MJP

1   disclosure of information in SEC filings puts investors on notice of that information); *accord*

2   *Whirlpool Fin. Corp.*, 67 F.3d at 610 ("A reasonable investor is presumed to have information in

3   the public domain, and therefore . . . is imputed with constructive knowledge of this

4   information."); *In re Infonet Serv. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1114 n.7 (C.D. Cal.

5   2003) (same).  This includes information in a registration statement exhibit, such as the "Form of

6   Dealer Agreement."  *See, e.g., Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1168 (7th Cir.

7   1995).[15]  The 2003 and 2004 Registration Statements attached newer versions of the "Form of

8   Dealer Agreement" that continued to reference the 50 Bps APF.  (Escobar Decl., Exs. F at 5-14,

9   I at 13, P at 13, Q at 16.)

10          On December 30, 2004, the Funds filed a revised Registration Statement that further

11  spelled out the revenue-sharing arrangement in the following terms:

12                 **WM ADVISORS ALSO OFFERS REVENUE SHARING
                   PAYMENTS, REFERRED TO AS AN "ADVISOR PAID
13                 FEE" TO ALL FINANCIAL INTERMEDIARIES WITH
                   ACTIVE SELLING AGREEMENTS WITH THE
14                 DISTRIBUTOR.  THE ADVISOR FEE IS PAID AT AN
                   ANNUAL RATE OF UP TO 0.50% OF THE AVERAGE NET
15                 ASSETS OF CLASS A AND CLASS B SHARES OF THE
                   PORTFOLIOS SOLD THROUGH SUCH
16                 INTERMEDIARIES.... THESE PAYMENTS ARE MADE
                   FROM WM ADVISORS' PROFITS AND MAY BE PASSED
17                 ON TO YOUR INVESTMENT REPRESENTATIVE AT THE
                   DISCRETION OF HIS OR HER FINANCIAL
18                 INTERMEDIARY FIRM.  THESE PAYMENTS MAY
                   CREATE AN INCENTIVE FOR THE FINANCIAL
19                 INTERMEDIARIES AND/OR INVESTMENT
                   REPRESENTATIVES TO RECOMMEND OR OFFER
20                 SHARES OF THE PORTFOLIOS OVER OTHER
                   INVESTMENT ALTERNATIVES**.

21

22  (Escobar Decl., Ex. L at 19, *emphasis in the original*.)  In this Registration Statement, the Funds

23  disclosed, in bold print, the following facts:  (1) the nature of the payments made to selling

24

25  [15] As the Seventh Circuit observed in *Eckstein*, 58 F.3d at 1168, "The registration statement is a public document, well known to all of the underwriters and dealers plus many of the brokers, and accessible to anyone else who wants

26  it."  Accordingly, investors have constructive knowledge of the facts concerning purported misstatements they could look up in a registration statement.  *See id.* at 1169.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 ● FAX: (949) 823-6994

1    dealers (including the 50 Bps APF); (2) broker-dealers and investment representatives may as a

2    result be incented to recommend the WM Portfolios over other investment alternatives; and (3) if

3    investors had any questions or concerns about these arrangements, they should "speak with

4    [their] investment representative to learn more about the total amounts paid to [their] investment

5    representative and his or her financial intermediary by the Portfolios, the Distributor, WM

6    Advisors, and by sponsors of other mutual funds he or she may recommend to [them]."

7    (Escobar Decl., Ex. L at 20, 22.)  The Funds' February 28, 2005 prospectus repeated these

8    disclosures with additional specifics.  (Escobar Decl., Ex. R at 8-18.)[16]  The disclosures in the

9    December 30, 2004 and February 25, 2005 prospectuses mirror Plaintiff's allegations and

10   foreclose any argument that by December 30, 2004, even a casual reader would know what

11   Plaintiff claims was hidden.

12        This lawsuit was not filed until August 20, 2008.  But because the 2002 Prospectus and

13   Registration Statement triggered inquiry notice on February 28, 2002, the one-year statute of

14   limitations for Lead Plaintiff's Securities Act claims expired on February 28, 2003, and the two-

15   year statute of limitations for her Exchange Act claims expired on February 28, 2004.  The

16   SAC's claims are therefore stale.  But even if the Court uses either the December 30, 2004

17   revised Registration Statement, the February 25, 2005 final Registration Statement, or the

18   February 28, 2006 Registration Statement as the document that triggered inquiry notice, the

19   SAC's claims are still stale.  As a result, the Court should dismiss the SAC in its entirety with

20   prejudice.[17]

21

22

23   _____

     [16] These statements were repeated yet again in the 2006 Prospectus filed by the Funds on February 28, 2006.
     (Escobar Decl., Ex. S at 15-17, 19-20, 22, 24, 27-28.)

24   [17] The *Zapien* action—which levied near-verbatim allegations against nearly all the same defendants—also placed
     Ms. Dumdie on inquiry notice of her claims.  (SAC ¶¶ 86–87.)  (Indeed, Ms. Zapien was represented by Finkelstein
25   & Krinsk, one of the firms representing Ms. Dumdie in this action.)  Because *Zapien* was filed on February 28,
     2007, the SAC's Securities Act claims are stale for this additional reason.  *In re American Funds Sec. Litig.*, 556 F.
26   Supp. 2d 1100, 1109 (C.D. Cal. 2008) (finding inquiry notice where earlier-filed complaint alleged nearly verbatim
     allegations).

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1    **B.      Almost All of the SAC's Claims Are Also Stale Under the Statutes of Repose**

2          Most of the SAC's claims are also time-barred under the applicable statutes of repose.

3    The Securities Act carries a three-year statute of repose.  *See* 15 U.S.C. § 77m.  For claims under

4    Section 11, the statute of repose runs from the effective date of the allegedly false registration

5    statement, and for claims under Section 12(a), it runs from the date of purchase.  *See id.*; *In re*

6    *Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1281 (E.D. Wash. 2007).  Since this Complaint was

7    filed August 20, 2008, the Court should dismiss as time-barred any Section 11 claims based on

8    Prospectuses and Registration Statements dated before August 20, 2005, and any Section 12(a)

9    claims premised on purchases before August 20, 2005.

10         Section 10(b) of the Exchange Act carries a five-year statute of repose running from the

11   date of the alleged violation.  28 U.S.C. 1658(b)(2); *Betz v. Trainer Wortham & Co., Inc.*, 519

12   F.3d at 872.  Thus, the Court should dismiss as time-barred any Section 10(b) claims based on

13   purported misrepresentations or omissions arising before August 20, 2003.

14   **C.      The *Zapien* Action Did Not Toll Plaintiff's Claims**

15         Recognizing that the aforementioned statutes of limitation and repose doom this action,

16   the SAC seeks shelter under the *American Pipe* tolling doctrine by alleging that the *Zapien*

17   action tolled its claims, presumably from the date Ms. Zapien filed her class action—

18   February 28, 2007 (SAC ¶¶ 86–90).  *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538,

19   553 (1974); *see also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) (allowing putative

20   class members to file separate individual lawsuits following the denial of a class certification,

21   rather than requiring them to intervene as individual participants in the original lawsuit).  But

22   *American Pipe* tolling cannot save Ms. Dumdie's stale claims.  First, tolling is unavailable

23   where, as here, the original action was dismissed for lack of standing.  Second, tolling permits

24   subsequent individual claims to be filed, not subsequent class claims.  Third, even if this

25   Complaint were judged by *Zapien*'s February 28, 2007 filing date, all of its claims would still be

26

MOTION TO DISMISS - 32
No. C-08-1251 MJP

time-barred.  Fourth, because Mr. Papesh and the Independent Directors were not named as

defendants in the *Zapien* action, there can be no tolling of the claims against them in this case.

### 1.    There is No *American Pipe* Tolling Where the Original Action Was Dismissed for Lack of Standing

When the original plaintiff (such as Zapien) does not have standing, *American Pipe* does

not toll a subsequent action.  For example, in *Palmer v. Stassinos*, the court held that "the filing

of a purported class-action complaint by a plaintiff who lacks standing does not toll the statute of

limitations for those who later seek to intervene as plaintiffs" because "federal courts may only

decide only cases and controversies, and a plaintiff without standing presents no live case or

controversy."  236 F.R.D. 460, 465–66 (N.D. Cal. 2006).  Similarly, in *Putkowski v. Irwin Home

Equity Corp.*, the court held that there was no *American Pipe* tolling because when the original

named plaintiff does not have standing, there is "nothing to toll."  423 F. Supp. 2d 1053, 1064

(N.D. Cal. 2006); *see also In re American Funds Sec. Litig.*, 556 F. Supp. 2d (refusing to apply

*American Pipe* tolling where original class action had been dismissed in part for lack of

standing).  Many courts outside the Ninth Circuit concur.[18]  Accordingly, because it was

dismissed with prejudice for lack of standing, the *Zapien* suit cannot toll the SAC's claims.

### 2.    *American Pipe* Tolling Does Not Allow Subsequent Class Actions

Moreover, even if tolling were available, it would only permit Ms. Dumdie to file an

individual claim for relief—not a class action lawsuit such as this one.  *Robbin v. Fluor Corp.*,

835 F.2d 213, 215 (9th Cir. 1987) (extending *American Pipe* tolling doctrine to class actions

"falls beyond its carefully crafted parameters into the range of abusive options").  In *In re*

*American Funds Securities Litigation*—a mutual funds case raising the identical issue in the

---

[18] *See, e.g., In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994) ("[I]f the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class."); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987) ("[I]t would be improper to allow the filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class to have the effect of tolling limitation to permit the otherwise untimely intervention of proper class representatives."); *Hobbs v. Police Jury of Morehouse Parish*, 49 F.R.D. 176, 178–81 (W.D. La. 1970).

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1    context of very similar claims—the class plaintiffs attempted to rely on *American Pipe* tolling to

2    piggyback their class action onto an earlier one that had been dismissed for, *inter alia*, lack of

3    standing.  556 F. Supp. 2d at 1111–12; *In re American Mutual Funds Fee Litig.*, No. CV 04-

4    5593-GAF (RNBx), 2005 WL 3989803, at *1–2 (C.D. Cal. Dec. 16, 2005) (opinion dismissing

5    original case).  They argued that if the original class action placed them on inquiry notice, "the

6    statute of limitations was tolled during the period that the [original] case was litigated as a class

7    action."  *American Funds*, 556 F. Supp. 2d at 1111.  Judge Feess rejected the argument,

8    distinguishing *Catholic Social Serv. v. INS,* 232 F.3d 1139 (9th Cir. 2000), a case in which the

9    Ninth Circuit permitted tolling because the class in the prior case had actually been certified

10    before the case was dismissed.  Judge Feess rejected tolling where the prior case had not

11    involved a certified class, agreeing with "those circuits that have expressly addressed the issue"

12    that tolling extends to individual claims but not subsequent class claims.  *Id.* (citing *Sheppard v.*

13    *Capital One Bank*, 06-7535 GAF (FFMx), 2007 U.S. Dist. LEXIS 70061, at *7 (C.D. Cal.

14    July 12, 2007)).  The vast majority of circuit courts to address this issue agree.[19]

15          As was the case in *American Funds, Catholic Social Services v. INS*, does not support

16    tolling in this case.  *Catholic Social Services* involved a complex, 15-year series of class actions.

17

18    [19] *See, e.g.*, *Basch v. The Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998) ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely"); *Griffin v. Singletary*, 17 F.3d

19    356, 359 (11th Cir. 1994) (pendency of class action did not toll limitations period for subsequent class actions by members of original asserted class); *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir. 1988) ("pendency of a previously

20    filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class"); *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987) (*American Pipe* tolling doctrine "does not apply to permit a plaintiff to file a subsequent class action following a definitive determination of the inappropriateness of

21    class certification"); *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1350 (5th Cir. 1985) (putative class members may not "piggyback" one class action onto another and thus toll the statute of limitations

22    indefinitely).  *But see Yang v. Odom*, 392 F.3d 97, 111-12 (3rd Cir. 2004) (holding that *American Pipe* tolling is available where the court originally denied class certification due to defects in class representatives rather than a

23    defect in the class itself, but emphasized that tolling would not continue indefinitely where plaintiffs repeatedly failed to put forth an adequate class representative); *In re Quarterdeck Office Sys. Inc. Sec. Litig.*, No. CV-92-3090-

24    DWW (GHKx), 1994 WL 374452 (C.D. Cal. Mar. 24, 1994) (tolling allowed where the prior case resulted in a denial of certification based on a lack of typicality); *Pierce v. Novastar Mortgage, Inc.*, Civ. No. 05-5825 RJB, 2006

25    US Dist LEXIS 62875, at *10-11 (W.D. Wash. Sept. 6, 2006) (finding the Third Circuit's precedent to be "somewhat persuasive" but declining to "definitively rule on the unsettled question of tolling due to prior cases"

26    because class certification was not proper for other reasons).

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1    In the first lawsuit, the district court certified the proposed class, but the United States Supreme

2    Court eventually reversed for lack of ripeness.  *Id.* at 1141–45; *see Reno v. Catholic Social Serv.,*

3    *Inc.*, 509 U.S. 43, 66–67 (1993).  Five years later, after several intervening proceedings, a second

4    lawsuit was filed and the Ninth Circuit ultimately allowed the class action to proceed despite the

5    earlier dismissal.  *Catholic Soc. Servs.*, 232 F.3d at 1142.  *Catholic Social Services* is

6    distinguishable because it—unlike *American Funds* and unlike this case—involved an original

7    class action that had been certified and "therefore did not involve any effort to circumvent a

8    prior ruling of the court or to piggyback one class action on another."  *American Funds*, 556 F.

9    Supp. 2d at 1111–12.  Specifically, *Catholic Social Services* only allowed tolling in that instance

10   because an earlier class had been certified, and "Plaintiffs in this case are not attempting to

11   relitigate an earlier denial of class certification, or to correct a procedural deficiency in an earlier

12   would-be class."  *Catholic Soc. Servs.*, 232 F.3d at 1149.  Here, Ms. Dumdie's action is

13   attempting to correct a more fundamental jurisdictional deficiency in the would-be *Zapien* class

14   action.  Thus, under either *Catholic Social Services* or *American Funds*, tolling of the class

15   claims is not permitted.  Therefore, even if *Zapien* had tolled Ms. Dumdie's claims (and it did

16   not), that would only permit Ms. Dumdie to bring an individual claim.  The class allegations

17   should still be dismissed.

### 3.    Even if Tolled, Most Claims in the SAC are Still Stale

19          Finally, even if Ms. Dumdie receives the benefit of *Zapien*'s filing date, the SAC's

20   claims remain time-barred.  As discussed above, investors were on inquiry notice of their claims

21   by February 28, 2002, meaning that the one-year statute of limitations for Securities Act claims

22   expired on February 28, 2003, and the two-year statute of limitations for Exchange Act claims

23   expired on February 28, 2004.  The *Zapien* complaint was filed on February 28, 2007.  Thus,

24   even if tolling were appropriate, the SAC would still be tardy by at least three years.[20]

---

[20] In addition, even if tolling were permitted, it would not save the claims against Mr. Papesh and the Individual
Directors because they were not named in the Zapien action.



O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1
2

# X.   MOST OF LEAD PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING

3

## A.   Plaintiff Has No Standing for Claims Based on Funds She Did Not Own

4          In a securities class action lawsuit, the court must take special care to ensure that standing

5    requirements are met.  *See Shurkin v. Golden State Vinters Inc*., 471 F. Supp. 2d 998, 1022 (N.D.

6    Cal. 2006) ("In a securities case, strict standing requirements are important to prevent potential

7    vexatious litigation.").  Under Article III, federal courts only have jurisdiction to hear a dispute if

8    it involves a "case" or "controversy."  U.S. Const. art. III, § 2; *see also Raines v. Byrd*, 521 U.S.

9    811, 818 (1997) (stating that the Supreme Court has "consistently stressed that a plaintiff's

10   complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged

11   injury suffered is particularized as to him.").  Moreover, actions under the Securities Act or the

12   Exchange Act may be brought only by purchasers or sellers of the securities at issue.  15 U.S.C.

13   § 77l(a); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975); *Zapien*, 2008 U.S.

14   Dist. LEXIS 67137, at *8; *AIG*, 2007 WL 1213395, at *11–12; *In re Bank of Boston*, 762 F.

15   Supp. 1525, 1531 (D. Mass. 1991).  Where, as here, many of the Plaintiff's claims are based on

16   securities she never purchased, the court should dismiss those claims for lack of standing.  *See,*

17   *e.g., AIG*, 2007 WL 1213395, at *4 ("In this securities fraud case, the named plaintiffs can allege

18   no injury from the purchase or sale of funds they never invested in."); *American Mutual Funds*,

19   2005 WL 3989803, at *1–2; *In re Eaton Vance Corp. Sec. Litig*., 219 F.R.D. 38, 42 (D. Mass.

20   2003).

21          Here, Ms. Dumdie only alleges purchases for half of the Funds at issue.  (SAC ¶ 16.)

22   And because Ms. Dumdie only has standing to sue on behalf of funds that she purchased, she

23   does not have standing with respect to the remaining twelve Funds.  As a result, the SAC's

24   claims as to those Funds do not present a "case" or "controversy" or meet the requirements of

25
26

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1   statutory standing under the securities laws.  Accordingly, the Court should dismiss all claims in

2   the SAC based on the mutual funds never owned by Ms. Dumdie.[21]

3   **B.     This Action Only Presents a Case or Controversy for the WM Portfolios**
        **Funds Owned by Ms. Dumdie**

4

5          The principal theory of recovery in the SAC is the alleged impropriety and illegality of

6   the allegedly undisclosed APF that was supposedly paid by WM Advisors to induce sales of

7   WM Portfolios, and not the WM Trust I and WM Trust II Funds.  (SAC ¶ 43.)  Because the

8   alleged misstatements, all deriving from the APF, relate only to the WM Portfolios, purchasers

9   of the WM Trust I and WM Trust II Funds suffered no injury that is fairly traceable to the

10  alleged unlawful conduct, and therefore have no standing to complain about this fee.  *See*

11  *Hoffman*, 2008 WL 4684168, at *5 ("If a party, such as Plaintiffs in this case, is not personally

12  injured by the alleged action of a defendant then he is not entitled to come into court and litigate

13  that action, regardless of whether the disposition of his case necessarily requires the same result

14  as the case of another.").

15         In sum, the Court should dismiss all claims based on any Funds other than the following

16  five WM Portfolios Funds owned by Ms. Dumdie:  (1) WM SAM Conservative Balanced;

17  (2) WM SAM Flexible Income; (3) WM SAM Conservative Growth; (4) WM SAM Balanced;

18  and (5) WM SAM Strategic Growth.

19  **XI.     THE SAC HAS NOT ESTABLISHED CONTROL PERSON LIABILITY**

20         The SAC has not only failed to meet the heightened standards of Rule 9(b) and the

21  PSLRA, but it has also failed to establish control person liability pursuant to Section 15 of the

22  Securities Act and Section 20(a) of the Exchange Act.[22]  To allege control person liability, a

23  _____

24  [21] Ms. Dumdie does not assert any interest in the following funds: Tax-Exempt Money Market, U.S. Government
    Securities, Income, High Yield, Tax-Exempt Bond, REIT, Small Cap Value, California Money, Short Term Income,

25  California Municipal, California Insured Intermediate Municipal and International Growth.
    [22] The standard for imposing liability under section 15 of the Securities Act is substantially the same as that for

26  imposing liability under section 20(a) of the Exchange Act.  As a result, courts rely on section 20(a) cases in
    evaluating section 15 matters.  *In re Metro. Sec. Litig.*, 532 F. Supp. 2d at 1296 n.12.

MOTION TO DISMISS - 37
No. C-08-1251 MJP

1   plaintiff must plead and prove (1) a primary violation of federal securities law and (2) that the

2   defendant exercised actual power or control over the alleged primary violator. *In re Metawave*

3   *Comm. Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003). The SAC fails to

4   fulfill either requirement.

5       **A.    Plaintiff Has Not Adequately Alleged a Primary Violation of Federal
              Securities Law Against Defendants Pavelich, Yancy, Blake, Papesh, WM**

6       **Advisors or WM Distributor**

7

8           Since the SAC's underlying claims fail for the reasons set forth in this motion, the

9   control person claims against the Independent Directors, Papesh, WM Advisors and WM

10  Distributor fail, too. *See, e.g., Pennsylvania Ave. Funds*, 2008 WL 426509, at *8; *Limantour v.*

11  *Cray Inc*., 432 F. Supp. 2d 1129, 1162 (W.D. Wash. 2006); *F.L. Heywood v. Cell Therapeutics,*

12  *Inc.*, No. C05-0396RSM, 2006 WL 5701625, at *8 (W.D. Wash. May 4, 2006); *In re*

13  *Watchguard Sec. Litig.*, No. C05-678J, 2006 WL 2038656, at *12 (W.D. Wash. Apr. 21, 2006).

14      **B**.   **Plaintiff Has Also Not Adequately Alleged Actual Control and Culpable
              Participation by the Independent Directors**

15

16          Even if Plaintiff could state a claim for primary violation of the securities laws,

17  Plaintiff's "control person" claims against the Independent Directors still fail because Plaintiff

18  does not plead specific facts sufficient to establish that the Independent Directors exercised

19  actual power or control over the alleged primary violator(s). Plaintiff's conclusory pleading that

20  the Independent Directors are controlling persons because they sit on the WM Group of Funds

21  Board of Trustees and "by virtue of their positions of operational control in the Registrants, and

22  the WM Distributor" does not set forth a relationship description sufficient to survive a motion

23  to dismiss. (SAC ¶¶ 23–25, 118.) In the Ninth Circuit, a plaintiff asserting "controlling person"

24  liability must show that there was a relationship between the controlling and controlled person

25  and that actual power or influence was exerted over the alleged controlled person. *Durham v.*

26  *Kelly*, 810 F.2d 1500, 1503–04 (9th Cir. 1987).

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1    Plaintiff's allegations do not satisfy either of these requirements.  Plaintiff's only

2  allegations against the Independent Directors are a simple description of the Independent

3  Directors as members of the WM Group of Funds Board of Trustees or members of certain

4  committees.  (SAC ¶¶ 23-25.)  This is not enough.  Rather, Plaintiff must allege specific facts to

5  establish that the Independent Directors had control through their day-to-day involvement in the

6  WM Funds or that their positions involved control of or involvement with the Funds'

7  Prospectuses and Registration Statements that Plaintiff alleges contain the alleged

8  misrepresentations.  *See e.g. In re Metawave Comm. Corp. Sec. Litig.*, 298 F. Supp. 2d at 1091

9  (references to individual's job title did not establish control person liability in the absence of

10  allegations of involvement in day-to-day affairs or in specific areas related to alleged

11  misrepresentations); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, No. 551, 1988 WL

12  158948, *20 (W.D. Wash. July 14, 1988) (holding that the nonmember participants, who voted

13  the respective shares of other participants they represented, had no direct means of controlling

14  the supply system and were not liable as control persons).

15    Here, Plaintiff gives no such factual details, but instead merely pleads the generalized

16  allegation that the Independent Directors "could have" corrected or prevented the issuance of

17  allegedly fraudulent registration statements.  (SAC ¶¶ 118, 134.)  This vague allegation does not

18  establish that the Independent Directors have engaged in the level of knowing participation in

19  day-to-day affairs necessary to make them "control persons."  *See, e.g.., Lapin v. Goldman Sachs

20  Group, Inc.*, 506 F. Supp. 2d 221, 246–47 (S.D.N.Y. 2006) (requiring that plaintiff plead

21  elements of control person liability with particularity); *Waldock v. M.J. Select Global, Ltd.*,

22  No. 03 C 5293, 2005 WL 3542527, at *6 (N.D. Ill. Dec. 27, 2005) (same).  As such, Plaintiff

23  fails to adequately allege that the Independent Directors culpably participated in the alleged

24  wrongdoing.

25    Accordingly, for these additional reasons, the SAC must be dismissed as to the

26  Independent Directors.

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA 92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994

1

## XII.   CONCLUSION

2

For the foregoing reasons, the SAC should be dismissed without leave to amend.

3

4   DATED:  January 26, 2009

By:  _____s/ Phillip Kaplan_____
    Phillip R. Kaplan, CA S.B. #76949

5   O'Melveny & Myers LLP
    610 Newport Center Drive, Suite 1700
    Newport Beach, CA 92660

6   Telephone:  (949) 760-9600
    Fax:  (949) 823-6994

7   E-mail:  pkaplan@omm.com

8   *Lead Counsel for Defendants WM Trust I, WM*
    *Trust II, WM Strategic Asset Management*

9   *Portfolios, LLC, Principal Financial Group,*
    *Inc., Principal Investors Fund, Inc., Edge Asset*

10  *Management, Inc. (formerly known as WM*
    *Advisors, Inc.), Principal Funds Distributor,*

11  *Inc. (formerly known as WM Funds Distributor,*
    *Inc.) and William G. Papesh  (admitted pro hac*

12  *vice)*

13
    By:  _____s/ Spencer Hall_____
        Spencer Hall, WASB # 6162

14  Hall Zanzig Claflin McEachern PLLC
    1200 Fifth Avenue, Suite 1414

15  Seattle, WA  98101
    Telephone:  (206) 292-5900

16  Fax:  (206) 292-5901
    E-mail:  shall@hallzan.com

17
    *Liaison Counsel for Defendants*

18
    By:  _____s/ Randall M. Lending_____

19      Randall M. Lending, IL S.B. # 06198407
    Vedder Price P.C.

20  222 North LaSalle, Suite 2600
    Chicago, IL  60601

21  Telephone:  (312) 609-7564
    Fax:  (312) 609-5005

22  E-mail:  rlending@vedderprice.com

23  *Counsel for Defendants Daniel L. Pavelich,*
    *Richard C. Yancey, and Kristianne Blake*

24  *(admitted pro hac vice)*

25

26

MOTION TO DISMISS - 40
No. C-08-1251 MJP

O'MELVENY & MYERS
610 NEWPORT CENTER DRIVE, SUITE 1700
NEWPORT BEACH, CA  92660-6249
TEL: (949) 760-9600 • FAX: (949) 823-6994